**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RYAN PATRICK DAVIDSON,<br><br>                              Petitioner,<br><br><br>v.<br><br><br><br>W.J. SULLIVAN, Warden,<br><br>                              Respondent. | Case No.:  17cv0421 H (MDD)<br><br>**(1)  REPORT AND RECOMMENDATION RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS; [ECF NO. 1]**<br><br>**(2)  ORDER DENYING MOTIONS FOR JUDICIAL NOTICE; [ECF NOS. 50, 64, 66]**<br><br>**(3)  ORDER DENYING MOTIONS FOR EVIDENTIARY HEARING; [ECF NOS. 44, 55, 57, 71, 73, 75]**<br><br>**AND**<br><br>**(4)  ORDER DENYING REQUEST FOR COPIES [ECF NO. 77]** |

## I.    INTRODUCTION

Petitioner Ryan Patrick Davidson ("Petitioner" or "Davidson"), a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction in case number

SCD236535.  (Pet. at 1, ECF No. 1 at 1.)[1]  Petitioner has also filed motions for an evidentiary hearing, motions for judicial notice and a request for copies.  (*See* ECF Nos. 43, 50, 64, 66, 71, 73, 75, 77.)  The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the Traverse, the lodgments, motions and all the supporting documents submitted by both parties.  For the reasons discussed below, the Court **DENIES** Petitioner's requests for judicial notice, **DENIES** the motions for an evidentiary hearing and **DENIES** the request for copies.  The Court further **RECOMMENDS** the Petition be **DENIED**.

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The following facts are taken from the California Court of Appeal opinion:

> The charges in this case arose from defendant's highly assaultive conduct on his girlfriend (CC) over a period of several months.  On September 13, 2011, CC fled from defendant and reported the domestic violence to a neighbor, her family, emergency room personnel, and police, including during a recorded interview.  By the time of trial, CC had recanted, claiming she consented to the infliction of injuries as part of a consensual BDSM (bondage, dominance, sadism, and masochism) relationship with defendant.  The trial court instructed on the defense theories of accident and reasonable belief in consent.  The jury rejected the defense claims and found defendant guilty.

> Defendant and CC started dating in 2008 and shortly thereafter defendant moved in with CC.  CC's roommate, who rented the upstairs area of her home to CC, testified she sometimes heard a lot of yelling, screaming, arguing, bumping, pounding, slapping, and things being thrown from CC's portion of the house.  She heard defendant and CC arguing more frequently

---

[1]  Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the court's electronic case filing system.

2

in about April 2011, and again in September 2011, and during this period they started "more and more . . . keeping to themselves." In the days before September 13, 2011, she heard defendant say in an irate voice, "'I can't understand why I have to keep telling you this over and over and over.'" CC's parents testified they noticed bruises on CC's face, neck, and arm during this timeframe, and CC variously said they were caused by a fall or because she had "'cheated'" on defendant.

On September 13, 2011, CC's neighbor and the neighbor's son were in their car when CC ran out of her residence and jumped into the back seat. CC was crying, frantic, and repeatedly screaming "'Get me out of here.'" CC told them her boyfriend had been beating her with a flashlight; he had been beating her for hours; and he had threatened her family and friends. CC showed them her arms, which were covered in bruises.

When fleeing her residence, CC did not have her cell phone, purse or keys, and she used her neighbor's cell phone to warn people about defendant's threats. CC left a message telling her roommate not to come home. She told her parents to get out of the house "'right now'"; defendant had her phone and her car; and he was going to kill them and all of her friends. CC's parents called 911 and fled their home.

Meanwhile, the neighbor assisted CC in contacting the police, and CC was transported by ambulance to the hospital. CC told the emergency room personnel her boyfriend had held her against her will for days and beaten her; he beat her with a flashlight, kicked her, and choked her; he hit her "multiple times in the same areas"; she was very afraid of him; and they had consensual sex but she wished "the domestic violence would just end." The emergency room personnel observed extensive bruising throughout her body, including on her face, neck, extremities, torso, abdomen, and pelvic area; a perforated ear drum; two bite marks (on her leg and chest); and a previously stitched lip laceration. The emergency room nurse testified CC's bruising from her shoulders to her elbows was "solid black, which [the nurse had] never seen before"; her arms, hands and jaw were swollen; she had a "hard time moving"; and she complained of pain from "head to toe," including ear pain. The emergency room physician testified CC was "the most severely bruised alive individual" he had seen in his career; her injuries were from "some form of blunt force"; the bruising pattern was "consistent with injury that has occurred over time"; the bruises could have been

/ / /

incurred within 48 hours to one or two weeks earlier; and the extent of the bruising required evaluation for internal injuries including blood tests, X-rays, and CT scans.

CC provided details about what occurred during two police interviews, and the second interview was recorded.  CC explained defendant was "emotionally unstable" and could "turn[ ] on a dime" if she "answer[ed] something wrong," and defendant's mother claimed he was bipolar. Defendant started hitting her in April 2011, and the assaults continued on and off in May, June, and August 2011.  During the arguments he would hit her and then they would talk, he would apologize, and it would be "okay" until they had another fight.  In May defendant hit her "really badly."  He bit her on her cheeks, slapped her face, and choked her.  When CC asked why he was hitting her, he would tell her she was hurting him "'on the inside'"; she was not listening and it was her fault; and he wanted to help her be a better person.  When they talked after their fights, they would have consensual sex, and she would ask herself how she could be intimate with someone who was hitting and hurting her, but she always thought defendant loved her and really did want to help her.

The assaults that culminated in CC's escape on Tuesday, September 13 occurred on and off from Saturday to Tuesday.  On Saturday defendant hit her with his fist, his shoe and a metal flashlight; kicked her; threw a bottle at her; choked her; hit her in the ears; and punched her in the stomach and vagina.  When she told him to stop, he said, "'You're begging me?  I begged you to stop hurting me and now you are begging me and you want me to stop?'"  She tried to deflect his blows by putting up her hands and covering her chest and abdomen, which would make him angrier and worsen the attack.  Defendant told her, "'I'm just gonna kill you.  I'm gonna scoop your fucking eyes out of your head so you don't have to see the rest of the world.  The rest of the world can just see how fucking ugly you are.'"  At one point on Saturday he cut her lip "wide open."  When she told defendant she thought she needed stitches, he took her to urgent care, where she told the staff that she had gotten into a fight with her "bipolar cousin."

Defendant became angry again on Sunday, and he kicked and punched her while she was in the shower.  On Monday she called her boss and said she would be working from home on Monday and Tuesday.  During a fight on Monday that lasted about two hours, defendant pushed, hit, and strangled her.

4

On Tuesday, when something she said displeased him, defendant put a towel under the door so no one could hear, and he "started really wailing" on her. He "continuously" hit her with his fists, hit her with the metal flashlight, kicked her, threatened to kill her, tried to cut her hand with a knife until she was able to twist her hand away, and held a flame to her hand. He told her, "'It would bring me no greater pleasure than to take everyone away from you [CC]. To take them apart piece by piece in front of you. You watch them suffer and then I'll take you and then I'll kill you.'" He saw how swollen her arms were, and he said, "'I'm gonna hit them. I'm gonna keep on hitting them until they split open. And when they split open [CC], I'm going to keep on hitting you after that. And then I don't know what I'm gonna . . . do. I really wanna kill you and leave you here so that nobody can help you and I'll just take off.'" At this point CC thought, "'Okay, he's really going to kill [me].'" She was finally able to escape when they left the house for an errand and then returned. Upon their return, she "lagged behind" defendant as they approached their residence. When he went inside the house, she slammed the door shut from the outside and ran to the neighbors who were in their car.

The same day that CC fled, defendant was arrested at their residence. The police found him hiding in an attic crawl space. Defendant told the police that he and his girlfriend had been arguing for several days and they got into a physical fight. He said that during the argument, "'I just wanted her to say the relationship was over and she wouldn't do it, so I beat the shit out of her'"; "'I can't believe I did that.'"

A prosecution mental health expert testified about common domestic violence patterns, including the not uncommon occurrence of recantation by the victim.

*Defense*

CC married defendant while he was in jail for the current charges. At trial, she claimed defendant never physically abused her and never physically assaulted her without her consent. [Footnote 1: Although CC was called to testify by the prosecution, her testimony was largely favorable to the defense.] She testified she had "a lot of issues with things about emotional pain"; she was a "pain slut"; she self-mutilates by putting cigarettes out on herself to release overwhelming emotions; she became interested in BDSM at about age 19; before she met defendant she engaged in consensual BDSM practices with a man she met on the Internet; and

BDSM "releases emotional stuff." She eventually told defendant about her past and her need for BDSM. In 2011 they began engaging in BDSM practices, including "gang rape play," "rope bondage," branding, choking, spanking, hitting, kicking, and use of riding crops, belts, a flashlight, and other implements. These practices resulted in bruising of CC; the bruises were "like a badge of honor" to her; and they had a "safe word" for her to use if she wanted him to stop.

CC testified some of her injuries, including the cut on her lip, resulted from an accidental fall that occurred when a rope came undone during their BDSM activity. She stated her bruising was the result of their BDSM activity; she asked defendant to inflict the bruising and wanted him to do so; and she "made him do more and continue" even when he did not want to and did not like seeing her in a bruised state. She claimed her parents "made" her report her injuries to the authorities and obtain a restraining order; she had not wanted to do this; and she lied about defendant physically abusing her and threatening to kill her and her family because she was angry at him and when she gets angry she "kind of explode[s]."

To support CC's claims of consensual BDSM activity, the defense presented testimony from CC and a computer forensics expert to show that CC had accessed websites concerning BDSM activity, and from two experts who provided opinions about BDSM and the evidence in the current case. A defense mental health expert testified CC met the criteria for "masochistic paraphilia based on her sexual excitement and reoccurring fantasies about being humiliated, hurt, and bound, and that this caused her . . . physical injuries."

(Lodgment No. 3 at 2-8.)

## III.  PROCEDURAL BACKGROUND

On February 11, 2013, the District Attorney filed an amended information charging Davidson with six counts:  torture (count one) (Cal. Penal Code § 206); four counts of corporal injury to a spouse or roommate (counts two, four, five and six) (Cal. Penal Code § 273.5(a)); and making a criminal threat (count three) (Cal. Penal Code § 422).  (Lodgment No. 1, vol. 1, ECF No. 33-1 at 6-8.)

/ / /

/ / /

As to count two it was further alleged that Petitioner inflicted great bodily injury on the victim (Cal. Penal Code § 12022.7(e)). It was also alleged that Petitioner personally used a deadly or dangerous weapon during the commission of counts two and three (Cal. Penal Code § 12022(b)(1)). (Lodgment No. 1, vol. 1, ECF No. 33-1 at 7.)

On February 27, 2013, a jury found Petitioner guilty on counts all counts. (Lodgment No. 1, vol. 2, ECF No. 33-3 at 252-57; *see also* Lodgment No. 2, vol. 4, ECF No. 33-8 at 845-47.) In addition, the jury found true the allegations that during the commission of count two, Petitioner inflicted great bodily injury and personally used a deadly weapon. (Lodgment No. 1, vol. 2, ECF No. 33-2 at 252; *see also* Lodgment No. 2, vol. 4, ECF No. 33-8 at 846.) The jury found the allegation that Davidson personally used a deadly weapon during the commission of count three to be not true. (Lodgment No. 1, vol. 2, ECF No. 33-2 at 254.) The court sentenced Davidson to five years plus an indeterminate life term.[2] (*Id.*, vol. 1, ECF No. 33-1 at 199-202; *see also* Lodgment No. 2, vol. 8, ECF No. 33-12 at 974-75.)

On December 26, 2014, Petitioner appealed his conviction in the California Court of Appeal. (Lodgment No. 3, ECF No. 33-14.) He argued defense counsel had abandoned him during closing argument and the trial court erred in instructing the jury on consent. (*See id.* at 46-51, 54-61.) On August 12, 2015, the appellate court affirmed the conviction in a reasoned opinion.[3] (Lodgment No. 6, ECF No. 33-17.) Davidson then filed a petition for review in the California Supreme Court, raising the same claims. (Lodgment No. 7, ECF No. 33-18.) On November 12, 2015, the court denied the petition without comment or citation. (Lodgment No. 8, ECF No. 33-19.)

---

[2] The court sentenced Petitioner on count one to an indeterminate life term, plus a base midterm on count four of 3 years and one year each for counts five and six. The court stayed the sentences for counts two and three pursuant to California Penal Code section 654. (Lodgment No. 1, vol. 2, ECF No. 33-3 at 199-202; *see also* Lodgment No. 2, vol. 8, ECF No. 33-12 at 974-75.)

[3] The appellate court also struck the $400 domestic violence fund fee that had been imposed by the trial court. (Lodgment No. 6, ECF No. 33-17 at 21-22.)

On May 16, 2016, Davidson filed a petition for writ of habeas corpus in San Diego Superior Court. (Lodgment No. 9, ECF No. 33-20.) In it, Petitioner claimed his *Miranda* rights were violated, the prosecutor presented false testimony and trial counsel was ineffective in a number of instances. (*See id.*) On July 7, 2016, the trial court denied the petition, finding that the *Miranda* claim was procedurally barred and the remaining claims failed on the merits. (Lodgment No. 10, ECF No. 33-25.)

Davidson then filed a habeas petition in the California Court of Appeal, raising the same claims presented in the petition filed with the trial court. (Lodgment No. 11, ECF No. 33-26.) On September 16, 2016, the appellate court denied the claims on the merits. (Lodgment No. 12, ECF No. 33-27.)

On October 1, 2016, Petitioner filed a second petition for habeas corpus in the San Diego Superior Court, raising the same claims. (Lodgment No. 13, ECF No. 33-28.) The trial court denied the petition as repetitive, citing *In re Lynch*, 8 Cal. 3d 410, 439 n.16 (1972) and *In re Miller*, 17 Cal. 2d 734 (1941). (Lodgment No. 14, ECF No. 33-30.) Davidson then filed a second habeas petition in the California Court of Appeal, raising the same three claims and adding two additional claims – his due process rights were violated when his confession was obtained involuntary and police committed misconduct during his arrest and questioning. (*See* Lodgment No. 15, ECF No. 33-31.) On November 4, 2016, the appellate court denied the petition on procedural grounds. (Lodgment No. 16, ECF No. 33-34.) Petitioner then filed a habeas petition in the California Supreme Court, raising the same five claims. (Lodgment No. 17, ECF No. 33-35.) The petition was summarily denied without comment or citation on January 11, 2017. (Lodgment No. 18, ECF No. 33-38.)

Davidson, proceeding pro se, filed the instant federal petition for writ of habeas corpus on February 27, 2017.[4] (ECF No. 1.) In it, Petitioner raises five claims. (*See id.*)

_____

[4] Davidson filed a "Supplemental Statement of Facts in Support of Original Petition for Writ of Habeas Corpus" on May 5, 2017. (ECF No. 22.)

Respondent filed an Answer on June 27, 2017. (ECF No. 32.) Davidson filed a Traverse on August 21, 2017. (ECF No. 37.) Petitioner then filed a Motion for Evidentiary Hearing on September 13, 2017. (ECF No. 43.) After considerable subsequent briefing (ECF Nos. 55, 57, 60, 61, 62), this Court denied the motion without prejudice on November 15, 2017, concluding that Petitioner's motion would be more appropriately addressed when the claims were reviewed on the merits in a Report and Recommendation. (ECF No. 63.) Davidson filed two subsequent requests for an evidentiary hearing on April 30, 2018 and May 21, 2018. (ECF Nos. 71, 73.) Petitioner has filed three "Requests for Judicial Notice." (ECF Nos. 50, 64, 66.) Finally, on June 5, 2018, Petitioner filed a "Motion for Copy of Local Rules and ECF Documents" and a supplemental copy of his most recent motion for an evidentiary hearing. (ECF Nos. 75, 77.)

## IV. SCOPE OF REVIEW

Davidson's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite

/ / /

17cv0421 H (MDD)

Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id*., the state court decision will not be "contrary to" clearly established federal law. *Id*. Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## V. DISCUSSION

Davidson raises five claims in his Petition: (1) his Sixth Amendment rights were violated when he received ineffective assistance of trial counsel, (2) his due process rights were violated by prosecutorial misconduct and presentation of false testimony at trial, (3) his *Miranda* rights were violated, (4) his confession was involuntary in violation of his due process rights, (5) and his constitutional rights were violated when the police engaged in misconduct during his arrest. (*See generally*, Pet., ECF No. 1.)

In the Answer, Respondent argues the state courts' denials of Davidson's claims one through four was neither contrary to, nor an unreasonable application of, clearly established law. As for claim five, Respondent argues habeas relief is foreclosed under *Stone v. Powell*, 428 U.S. 465 (1976). (*See* P. & A. Supp. Answer, ECF No. 32-1.) For ease of analysis, the Court will address Petitioner's claims in a different order than presented in the Petition.

### A. *Miranda* (ground three)

Davidson alleges his confession was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Specifically, he contends he was incapacitated by an overdose of Benadryl and unable to knowingly and intelligently waive his rights *Miranda* rights before giving a statement to Officer Bianco. (Pet., ECF No. 1 at 32-34; *see also* Traverse, ECF No. 37 at 8-10.) Respondent asserts the state court's denial of this claim

/ / /

/ / /

/ / /

was neither contrary to, nor an unreasonable application of, clearly established law.[5]  (*See* Mem. P. & A. Supp. Answer, ECF No. 32-1 at 21-23.)

Davidson raised this claim in his petition for writ of habeas corpus to the California Supreme Court and it was denied without comment or citation.  (Lodgment Nos. 16 & 17, ECF Nos. 33-35, 33-38.)  This Court therefore looks through to the last reasoned state court decision to address this claim – that of the California Court of Appeal.  *See Ylst*, 501 U.S. at 805-06.  In denying the *Miranda* claim, the appellate court stated:

> Many of Davidson's contentions challenge the testimony of a police officer in which the officer stated that Davidson waived his rights after a valid *Miranda* warning and admitted he hit CC.  In his petition, Davidson alternatively contends that he was not give a *Miranda* warning, that he *was* given a *Miranda* warning but was under the influence of drugs at the time such that he lacked the capacity to waive his rights, or that he was never "admonished or interrogated" and the police fabricated his admission. Regardless of the exact theory, Davidson's contentions amount to a claim that the officer lied at trial in some regard.  Davidson, however, presents no evidence to support his conclusion beyond inconclusive medical records regarding his mental state unsupported by expert testimony.
>
> . . .
>
> A petitioner seeking habeas corpus relief bears a heavy burden to plead and prove sufficient grounds for relief.  (*People v. Duvall* (1995) 9 Cal. 4th 464, 474.)  "At the pleading state, the petition must state a prima facie case for relief.  To that end the petition should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the

---

[5] Respondent also contends the claim is procedurally defaulted.  (*See* Mem. P. & A. Supp. Answer, ECF No. 32-1 at 20.)  This Court need not address the procedural default issue because the claim fails on the merits.  *See Lambrix v. Singletary*, 520 U.S. 518, 522-25 (1997) (holding that a federal court need not invariably resolve a state procedural bar issue first where it presents complicated issues of state law and the other issue is easily resolvable against the petitioner); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (finding that it is proper to proceed to merits where procedural bar issue more complicated and result is the same).  The Court notes, nonetheless, that the appellate court denied Davidson's *Miranda* claim on the merits and, unlike the trial court, did not apply a procedural bar.  (*See* Lodgment No. 12, ECF No. 33-27 at 2; *see also* Lodgment No. 10, ECF No. 33-25 at 2-3.)

17cv0421 H (MDD)

claim , including pertinent portions of the trial transcripts and affidavits or declarations.'" (*In re Martinez* (2009) 46 Cal. 4th 945, 955-956.) Conclusory allegations made without any explanation of their factual bases are insufficient to state a prima facie case or warrant an evidentiary hearing. (*People v. Duvall*, *supra*, at p. 474.)

In the absence of other evidence, Davidson contends that this court must accept his own declaration, which he contends offers the true version of events and reveals the lies of the other witnesses. A self-serving declaration by a habeas corpus petition is, by itself, insufficient to meet the burden of stating a prima facie case for relief. (*In re Alvernaz* (1992) 2 Cal. 4th 924, 939, 945.)

(Lodgment No. 12, ECF No. 33-27 at 2.)

In *Miranda*, the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted into evidence. *Miranda*, 384 U.S. at 443-45. *Miranda* and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts. *See id.* The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005); *Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir. 2004).

Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently. *See Miranda*, 384 U.S. at 475. There is a distinction between a claim that a *Miranda* waiver was not voluntary and a claim that such waiver was not knowing and intelligent. *Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008). The voluntariness component turns on the absence of police overreaching, i.e., external factors, whereas the cognitive component depends upon the defendant's mental capacity. *Id*.

A valid waiver of *Miranda* rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant. *See United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). The waiver need not be express as long as

/ / /

17cv0421 H (MDD)

the totality of the circumstances indicate it was knowing and voluntary. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Juan H*., 408 F.3d at 1271.

Here, Davidson argues his *Miranda* waiver was both unknowing and involuntary because he was under the influence of Benadryl at the time. (*See* Pet., ECF No. 1 at 32-33.) First, a brief summary of the events leading up to Davidson's statement to Officer Bianco is helpful. On the evening of September 13, 2011, Davidson's girlfriend, Charlene, fled from Petitioner, jumping suddenly into the back seat of a car driven by a neighbor, Victoria Hall. (Lodgment No. 2, vol. 2, ECF No. 33-5 at 200.) Charlene was "frantic" and kept screaming "Get me out of here." (*Id*. at 200-03.) She told Hall that her boyfriend had been beating her with a flashlight "for hours." (*Id*. at 200-01.) Charlene was covered in bruises. (*Id*. at 201, 210-11.) Hall drove Charlene to nearby police substation. (*Id*. at 202.) Charlene reported to Officer Demas that Davidson had been abusing her for days prior to her escape. (*Id*. at 384-85.)

Officer Pimienta and other law enforcement were dispatched to Charlene and Davidson's residence, arriving at about 8:19 p.m. (*Id*. at 425.) After a two hour stand-off, Davidson was finally taken into custody. Officers, with assistance from a police canine, found Davidson hiding in an attic crawl space above the upstairs bedroom. (*Id*. at 425-28.) At that time of his arrest, Davidson told officers he had taken "a lot of Benadryl." Officer Pimienta[6] testified that Davidson looked ashen and was not speaking clearly. He was transported to the hospital. (*Id*. at 425.)

Officer Bianco, who had arrived at the scene at approximately 10:45 p.m., rode in the ambulance with Petitioner. (*See id*. at 445; *see also* Pet., ECF No. 1-4, Ex. OO at 217.) Officer Bianco testified that in the ambulance, Davidson was "kind of out of it, unresponsive, not really answering any kind of questions that the medics – I was not asking him anything, but the medics were asking him questions. And he was

---

[6] In some portions of the record, Officer Pimienta is referred to by her maiden name, "Hupp." (*See* Lodgment No. 2, vol. 2, ECF No. 33-6 at 423, *see also* Pet., Ex. OO, ECF No. 1-4 at 217.)

unresponsive." (*Id.* at 440.) Upon arriving at the hospital, Davidson was treated by staff. Officer Bianco stated that as time when on, Davidson "became more responsive and talkative." (*Id.*) Officer Bianco testified further, as follows:

> [Prosecutor]:     So what did you do next?
>
> [Off. Bianco]:     As he became more coherent, I admonished him according to my PD145 of his Miranda rights.
>
> Q:     So can you explain that a little bit, please?
>
> A:     We have, all of us carry around something called the PD145. And on the back of it, it explains -- it gives the Miranda rights as we are to read them. And we read them the same every time. And I read them to Mr. Davidson.  I asked him if he understood his rights. And he said yes.
>
> Q:     And so what did -- did he talk to you about what had happened?
>
> A:     I asked him if he understood his rights. And he said yes. I asked, would he be willing to speak to me. And he said yes.  So I asked him questions regarding the incident.
>
> Q:     So what did he tell you?
>
> A:     He said that he and his girlfriend had been having problems over the past few days and three days prior to the incident they got into a physical fight.
>
> Q:     Three days prior to the 13th?
>
> A:     Yes.
>
> Q:     Then what else did he say?
>
> A:     He said during that fight he pushed her and caused her to get a cut on her chin and she needed medical attention for it.
>
> Q:     Did he tell you whether or not she did receive medical attention for that?

///

17cv0421 H (MDD)

A:    He said they did go to the hospital, but he could not remember what hospital it was.

Q:    And what else did he tell you about what had happened?

A:    He said that, that the argument didn't really end there and it continued as they went home and over the course of the next few days. And during the argument he wanted her to tell him that their relationship was over. And she wouldn't do that. So because she wouldn't do that he, quote, "Beat the shit out of her."

Q:    Now, were those the exact words he used?

A:    I don't know that exact words. I have the exact words written down if you would like me to reference it.

Q:    Yes, please, I can go ahead and look up.

A:    Davidson said to me, "I just wanted her to say the relationship was over and she wouldn't do it, so I beat the shit out of her."

Q:    Is that something you noted in your report?

A:    I did.

Q:    Did you put quotations around it?

A:    I did.

Q:    For you, when you write a report, what does that mean?

A:    When I write a report?

Q:    Yes.

A:    What do you mean?

Q:    When you use quotations?

A:    It means a direct quote from the person saying it.

Q:     Okay.  Now, what else did he tell you about what had happened?

A:     Well, he wasn't really – he was kind of erratic with his statement, not really following any kind of timeline.  But he did report over and over, "I can't believe I did that."

Q:     Did he tell you anything else?

A:     Not really.

(*Id.* at 440-42.)

On cross-examination, Officer Bianco reiterated that, after observing Davidson at the hospital for a period of time, he noticed that Davidson began "responding rather appropriately" to questions from the medical staff.  Based on Davidson's responses, Bianco concluded that Petitioner would be able to understand a *Miranda* admonishment.  (*Id.* at 454.)  Bianco also testified that he could not recall exactly what time it was when Davidson started coming around but estimated it was "around 11:00 o'clock or maybe later, midnight."  (*Id.* at 440-41.)   Officer Bianco stated that he was with Davidson in the ambulance and at the hospital for about 90 minutes total.  But he only questioned Davidson for "about 10 minutes," during that time.  (*Id.* at 443.)

Petitioner points to medical records to support his claim that he was unable to consent to waiver of his *Miranda* rights.  From the University of California, San Diego (UCSD) Medical Center records, it appears Davison was initially evaluated and treated by medical staff at 11:36 p.m.  The "Admission Summary," section of the report lists Davidson's vital signs, notes that "IV fluids" were administered and blood drawn.  The admission report also includes the term "BARRIER – cognitive."  (Pet., Ex. M, ECF No. 1-2 at 113.)  Further, the records indicate that the ambulance medics reported Davidson had taken an "unknown amount of Benadryl to kill himself."  (*Id.* at 114.)  The notes also indicate that when initially evaluated, Petitioner was "somnolent awakens to physical stimuli oriented to self only."  (*Id.*)   Another notation at 11:56 p.m. states that a

physician determined that Benadryl toxicity was "unlikely." (*Id.* at 116.) Additionally, the treating physician stated Davidson was "sleepy, arouses to voice" and "alert oriented to person/place." (*Id.* at 117.) At 12:29 a.m., the doctor noted a "marked improvement in mentation." (*Id.*) By 4:19 a.m., Davidson was medically cleared by doctors and transported to jail. (*Id.*)

The state court's denial of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established law. As discussed above, Officer Bianco testified that he waited at the hospital and stood by while medical professionals evaluated and treated Petitioner. Officer Bianco stated that he only admonished Davidson after he observed him improving and responding appropriately to medical staff. The records are consistent with Officer Bianco's testimony that Davidson was groggy and confused in the ambulance and, after being admitted to the hospital, gradually began to improve and become more alert. For instance, the physician noted that Davidson's "mentation" was markedly improved at 12:29 a.m., less than an hour after he was initially evaluated and treated. Although Officer Bianco could not remember exactly what time he admonished Petitioner, he stated that it was after Petitioner had been treated and showed an improvement. It appears the majority of the time he was with Petitioner, Officer Bianco was merely observing his treatment. Indeed, as noted above, he testified that he only questioned Davidson for about 10 minutes of the total 90 minutes he was with him. Thus, nothing in the medical records is inconsistent with Bianco's testimony that Davidson understood the admonishment and voluntarily waived his *Miranda* rights.

Even assuming Davidson was still groggy from the Benadryl when Officer Bianco admonished him, that alone is insufficient to undermine the validity of his waiver. As the Ninth Circuit has observed, "the Supreme Court has never said that impairments from drugs, alcohol, or other similar substances can negatively impact the waiver." *Matylinsky v. Budge*, 577 F.3d 1083, 1095 (9th Cir. 2009) ("We have held that an intoxicated individual can give a knowing and voluntary waiver, so long as that waiver is given by his own free will."); *see also Shackleford v. Hubbard*, 234 F.3d 1072, 1080 (9th Cir.

2000) ("The fact that a suspect is under the influence of drugs or medication is irrelevant if the suspect's statement was the product of a rational intellect and a free will." (quotations omitted)); *United States v. Muniz*, 1 F.3d 1018, 1022 (10th Cir. 1993) (upholding waiver despite evidence defendant was drunk, and had a blood-alcohol level of .268). Thus, even assuming Davidson was under the influence of Benadryl, he has failed to show his waiver not a product of his own free will, or otherwise unintelligent. *See Matylinsky*, 577 F.3d at 1095.

Moreover, Davidson has not alleged that Officer Bianco engaged in conduct considered coercive, intimidating, or deceptive. And there is nothing in the record suggest any police overreach in obtaining Davidson's *Miranda* waiver. As such, Davidson has not established his waiver was involuntary. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (stating that conclusory allegations unsupported by specific factual allegations do not warrant habeas relief); *see also Cox*, 542 F.3d at 675.

In sum, given the totality of the circumstances, the state court's denial of Davidson's *Miranda* claim was neither contrary to nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. The Court therefore **RECOMMENDS** the claim be **DENIED**.

## B.    Coercion (ground four)

Davidson next claims that his hospital statement to Officer Bianco was obtained in violation of his due process rights. (*See* Pet., ECF No. 1 at 37-39.) Davidson raised this claim in his petition for habeas corpus filed with the California Supreme Court. The court denied the petition without comment or citation. (Lodgment No. 18, ECF No. 35-38.) As such, this Court look through to the last reasoned state court opinion – the California Court of Appeal's November, 22, 2016 denial of Davidson's habeas petition. *See Ylst*, 501 U.S. at 805-06.

The appellate court denied Davidson's claim under California's procedural rules. (*See* Lodgment No. 16, ECF No. 33-34.) Specially, the court found the claims was barred from review because Petitioner failed to raise it on direct appeal. (*Id.* at 1 (citing

17cv0421 H (MDD)

*In re Dixon*, 41 Cal. 2d 756, 759 (Cal. 1993)). The court also noted the claim was barred under the state's rule against successive petitions. (Lodgment No. 16, ECF No. 33-34 at 2 (citing *In re Clark,* 5 Cal. 4th 750, 769 (Cal. 1993)). Because the court of appeal rejected Davidson's coercion claim on procedural grounds, this court will review the claim de novo.[7]   *See Stanley*, 633 F.3d at 860; *Reynoso*, 462 F.3d at 1109.

Even absent a *Miranda* violation, a confession must be suppressed when the totality of the circumstances demonstrate that the confession was involuntary. The use of an otherwise involuntary confession violates a criminal defendant's right to due process under the Fourteenth Amendment. *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960); *DeWeaver v. Runnels*, 556 F.3d 995, 1002-03 (9th Cir. 1990). A confession is coerced or involuntary if "the defendant's will was overborne at the time he confessed." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). Coercion can be mental or physical, but to render a statement involuntary, coercion must exist to such a degree that the statement is not "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *see also Blackburn*, 361 U.S. at 206.

In making this determination, the court must consider "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (same). Relevant factors include the youth of the defendant, his intelligence, the location and length of detention, the prolonged nature of the questioning, use of psychological or other ploys (i.e. guilt or fear), the use of physical punishment such as the deprivation of food or sleep, and any failure to advise the defendant of his

_____

[7] Respondent does not allege that Davidson's due process claim is procedurally defaulted. *See Bennett v. Mueller*, 322 F.3d  573, 586 (9th Cir. 2003) (holding that the initial burden to be met in determining the adequacy of a state procedural bar is Respondent's and as such the state must "adequately ple[a]d the existence of an independent and adequate state procedural ground as an affirmative defense").

17cv0421 H (MDD)

constitutional rights. *See Withrow v. Williams*, 507 U.S. 680, 693-94 (1993); *Schneckloth*, 412 U.S. at 226; *Doody*, 649 F.3d at 1008-09.

A necessary predicate to finding a confession involuntary is the "crucial element" of overreaching, coercive activity by the police that is causally related to the confession. *Colorado v. Connelly*, 479 U.S. 157, 163-64 & n. 1 (1986). The defendant's mental condition is relevant to determining his susceptibility to police coercion, but mental deficiencies alone in the absence of police coercion do not render a confession involuntary. *Connelly*, 479 U.S. at 165. Absent coercive police misconduct, there is simply no basis for concluding that a confession was involuntary in violation of due process. *Id.* at 167.

The fact that a suspect is under the influence of alcohol or drugs will not necessarily render a confession involuntary. *See Pollard v. Galaza*, 290 F.3d 1030, 1034-36 (9th Cir. 2002); *United States v. George*, 987 F.2d 1428, 1430-31 (9th Cir. 1993) (defendant's statements to police found voluntary even though defendant was in hospital, suffering from possible drug overdose, and "undoubtedly in critical condition" (but not "unconscious or comatose"), where police asked "simple questions" and kept interview "short," and defendant did not indicate that he wanted a lawyer); *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (rejecting claim that intoxication rendered petitioner's responses to police questions involuntary since, at the time of the interrogation, petitioner was able to obey officers' orders); *United States v. Martin*, 781 F.2d 671, 673-74 (9th Cir. 1985) (holding statements voluntary where defendant under influence of pain killer and still in pain, groggy though awake and fairly coherent, and spoke freely with police and where there was no evidence of extended/oppressive questioning).

Here, there is no evidence that the Benadryl side effects rendered Petitioner's statement involuntary. As discussed above in section IV(B) of this Report and Recommendation, Officer Bianco's testimony was consistent with the information contained in the medical records. When Petitioner first arrived at the hospital, he was reportedly groggy and somewhat unresponsive. After receiving treatment from the

medical staff, Davidson began to improve.  In less than an hour after his initial

evaluation, the physician noted a "marked improvement" in Davidson's mental state.

Officer Bianco testified that he waited until after Davidson was responding appropriately

to the medical staff before admonishing and questioning him.  And Officer Bianco

questioned Davidson only briefly, for approximately 10 minutes.   There is no evidence

in the record of coercive police misconduct.  *See United States v. Kelley*, 953 F.2d 562,

565 (9th Cir. 1992) (citing examples of police overreaching, including lengthy

questioning, deprivation of food or sleep, physical threats of harm, and forms of

psychological persuasion), *overruled on other grounds by United States v. Dearing*, 9

F.3d 1428 (9th Cir. 1993).  Accordingly, Davidson's claim that his confession was

obtained in violation of his due process rights is without merit.  The Court

**RECOMMENDS** ground four be **DENIED**.

### C.   <u>False Testimony (ground two)</u>

Davidson contends that the prosecutor committed misconduct by presenting false

evidence and testimony.  Specifically, he argues that the prosecution improperly

presented "false" statements that Charlene made to Officers Demas and Hernandez when

she reported the abuse.  (Pet., ECF No. 1 at 25-26; *see also* Traverse, ECF No. 37 at 19-

22.)  Petitioner raised this claim in his petition for writ of habeas corpus to the California

Supreme Court.   (Lodgment No. 17, ECF No. 33-35 at 39-48.)  The petition was denied

without comment or citation.  (Lodgment No. 18, ECF No. 33-38.)  As such, this Court

looks through to the last reasoned state court decision – in this case, that of the California

Court of Appeal.  *See Ylst*, 501 U.S. at 805-06.   In denying the claim, the appellate court

stated:

> [Petitioner] contends the prosecutor knowingly introduced perjured
> testimony, but submits no evidence regarding the prosecutor's knowledge or
> whether the testimony was indeed false.

> A petitioner seeking habeas corpus relief bears a heavy burden to
> plead and prove sufficient grounds for relief.  (*People v. Duvall* (1995) 9
> Cal.4th 464, 474.)  "At the pleading stage, the petition must state a prima

facie case for relief.  To that end, the petition 'should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and  affidavits or declarations.'"  (*In re Martinez* (2009) 46 Cal.4th 945, 955-956.)  Conclusory allegations made without any explanation of their factual bases are insufficient to state a prima facie case or warrant an evidentiary hearing.  (*People v. Duvall, supra*, at p. 474.)

In the absence of other evidence, Davidson contends that this court must accept his own declaration, which he contends offers the true version of events and reveals the lies of the other witnesses.  A self-serving declaration by a habeas corpus petitioner is, by itself, insufficient to meet the burden of stating a prima facie case for relief.  (*In re Alvernaz* (1992) 2 Cal.4th 924, 939, 945.)

(Lodgment No. 12, ECF No. 33-27 at 2-3.)

"The knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside." *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of the State of Illinois*, 360 U.S. 264, 269 (1959).  However, the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence.  *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002).  To prevail on such claims, three things are required: (1) the testimony or evidence must be false, (2) the prosecution must have known or should have known it was false, and (3) the false testimony must be material.  *See Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (citing *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)).   For purposes of a *Napue* violation, evidence is "material" if there is "'*any* reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (emphasis in original) (citation omitted).

/ / /

17cv0421 H (MDD)

Here, Charlene's statements to police and subsequent trial testimony provided the basis for the prosecution and defense, respectively. The jury was presented with two, largely conflicting, versions of events from Charlene. In her initial statements to Officers Demas and Hernandez, Charlene reported that Davidson had assaulted over the course of several days (September 10-13, 2011) before her escape. She stated that Davidson hit her with both open and closed fists, kicked her, bit her, choked her and struck her repeatedly with a flashlight. (*See* Lodgment No. 2, vol. 2, ECF No. 33-6 at 386-88; *see also* Lodgment No. 1, vol. 1, ECF No. 33-2 at 49, 50-51, 53, 63, 81-82.) She also told Officers Demas and Hernandez that Davidson had been violent toward her on the past. (*See* Lodgment No. 2, vol. 2, ECF No. 33-6 at 386-87, 399-400; *see also* Lodgment No. 1, vol. 1, ECF No. 33-2 at 35, 39-42.)

Charlene's statements to Officer Demas and Hernandez were consistent with what she had told Victoria Hall and her son Cody, after she suddenly jumped in Hall's car to escape from Davidson. Charlene told Hall her boyfriend had been beating her for hours with a flashlight. (Lodgment No. 2, vol. 1, ECF No. 33-5 at 200-01, 211-12.) While in Hall's car, Charlene also called her parents to warn them that Petitioner had threatened them. (*Id.* at 202, 208.) Her parents, in turn, called 911 to report what Charlene had told them. (*See* Lodgment No. 1, vol. 1, ECF No. 33-2 at 17-28.) Charlene also told Kelly Griffin, an emergency room nurse who treated her on September 13, 2011, that she had been beaten, kicked and choked by her boyfriend. (Lodgment No. 2, vol. 2, ECF No. 33-6 at 481-83.) Charlene stated that her boyfriend had beaten her repeatedly over the course of several days. (*Id.* at 482, 497.)

In contrast, Charlene testified at trial that her initial statements to police, her parents, neighbors and medical personnel were all lies and that her injuries were the result of consensual bondage, dominance, sadism, and masochism (BDSM) sexual activity. (*See* Lodgment No. 2, vol. 1, ECF No. 33-5 at 139-40; vol. 2, ECF No. 33-6 at 320-21, 328-30, 337-40, 354-56.) She testified that she had felt pressure from her family and had fabricated the abuse claims because she was hurt by Davidson telling her that he

wanted to leave her. (Lodgment No. 2, vol. 1, ECF No. 33-5 at 140-41.) All of her injuries, including the cut lip, extensive bruising of her arms, legs, torso and neck, were the result of consensual sexual activity. (*Id.* at 125-28.)

Charlene's trial recantation was not a surprise to the prosecutor or the defense. She had changed her story well before trial. (*Id.* at 20.) She had married Davidson in July 2012, while Davidson was in jail awaiting trial. (*See id.* at 101.) She also paid for Davidson's retained defense attorney. (*Id.* at 146-47.) Charlene's statements to Officers Demas and Hernandez were admitted, in part, as prior inconsistent statements to impeach the credibility of her trial testimony. (*See* Lodgment No. 2, vol. 1, ECF No. 33-5 at 234-35.) The prosecution's entire theory of the case was based on the premise that Charlene's initial statements were generally accurate and her subsequent trial testimony recanting those statements, was false. (*See generally, id.*, vol. 4, ECF No. 33-8 at 763, 767-73.) In contrast, the defense's theory was that Charlene's initial accusations of domestic violence against Davidson were lies, and that her trial testimony that the injuries were the result of consensual conduct, was truthful. (*See generally id.* at 790-91, 797-98.)

Davidson argues in his Petition, as his defense counsel did at trial, that Charlene's statements to Officers Hernandez and Officer Demas were false. (Pet., ECF No. 1 at 24.) Even assuming falsity for the sake of argument, however, there is nothing to suggest that the prosecutor knew or should have known those statements are false. Indeed, based on the statements, and corroborating testimony of other witnesses, it is clear that the prosecutor reasonably believed Charlene's original statements were generally truthful. And as both counsel argued, it was for the jury to determine whether Charlene was a credible witnesses and how much of her initial statements and/or her trial testimony to believe. *See, e.g., Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (noting that it is province of jury to determine credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts).

/ / /

/ / /

Furthermore, the jury was specifically instructed that it alone was to determine witness credibility. They were instructed to, among other things, take purported inconsistencies and contradictions into consideration when evaluating a witness's credibility. The instruction, pursuant to CALCRIM No. 105, stated:

> You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may
>
> believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.
>
> In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:
>
> • How well could the witness see, hear, or otherwise perceive the things about which the witness testified?
>
> • How well was the witness able to remember and describe what happened?
>
> • What was the witness's behavior while testifying?
>
> • Did the witness understand the questions and answer them directly?
>
> • Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?
>
> • What was the witness's attitude about the case or about testifying?
>
> • Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?
>
> • How reasonable is the testimony when you consider all the other evidence in the case?

/ / /

• Did other evidence prove or disprove any fact about which the witness testified?

• Did the witness admit to being untruthful?

Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest.

(Lodgment No. 1, vol. 1 ECF No. 33-1 at 104-05; *see also* CALCRIM No. 105.) "A jury is presumed to follow the trial court's instructions." *Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2016) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). And a jury's credibility determination is "entitled to near-total deference." *Bruce*, 376 F.3d at 957; *see also Carothers v. Rhey*, 594 F.2d 225, 229 (9th Cir. 1975).

Petitioner points to specific portions of Charlene's statements he contends were not truthful. For instance, Officer Demas testified that Charlene told him that Davidson physically abused her for the first time on August 20, 2011. (*See* Lodgment No. 1, vol. 2, ECF No. 33-6 at 385.) When Charlene gave a more lengthy statement to Officer Hernandez the next day, she stated that the first instance of abuse was in April of 2011. (*See* Lodgment No. 1, vol. 1, ECF No. 33-2 at 35.) Davidson argues this discrepancy in dates establishes that Charlene lied during her statements to the officers and that the prosecutor knew or should have known her statements were false. (Pet., ECF No. 1 at 25.)

He also claims that Charlene lied when she told Officer Hernandez that Davidson had burned her hand. (*Id.* at 26.) He notes that Hernandez testified at trial that he did not

remember seeing burns on Charlene and concludes this establishes that Charlene was lying. (*See* Lodgment No. 2, vol. 2, ECF No. 33-6 at 544.) Likewise, Davidson states that Charlene's statement to Officer Hernandez that Davidson had punched her with his fists for hours was false. He argues it is "common knowledge that after such an alleged attack [his] hands would be very injured." (Pet., ECF No. 1 at 27.) He claims that photos taken after his arrest show his hands were free from injury. This, he contends, establishes that Charlene's statements were false and that, based on these inconsistent statements, the prosecutor knowingly presented false evidence. (*Id.*)

Finally, Davidson argues that Charlene lied when she told Officer Hernandez that she had vaginal bleeding that may have been a result of Davidson kicking her in the lower abdomen. Davidson claims the bleeding was actually the result of Charlene's normal menstruation cycle. (*See* Pet., ECF No. 1 at 27.) He also points to testimony from Dr. Clayton Whiting, who treated Charlene at the emergency room. Dr. Whiting testified that he performed CT scans of Charlene's chest abdomen and pelvis to check for internal injuries. (Lodgment No. 2, vol. 3, ECF No. 33-7 at 591-92.) He stated that the scans revealed "no solid organ injuries." (*Id.* at 592.)

Not every discrepancy in testimony translates into perjury. *Lambert v. Blackwell*, 387 F.3d 210, 249 (3d Cir. 2004). The presentation of a conflicting version of events does not establish the prosecutor's knowing use of perjured testimony. Falsity is not established merely by showing that the witness made an earlier inconsistent statement, or that the witness's testimony differs from that of another witness. *See Zuno-Arce*, 44 F.3d at 1423; *see also Geston*, 299 F.3d at 1135; *Tayborn v. Scott*, 251 F.3d 1125, 1131 (7th Cir. 2001) (stating mere inconsistencies in the testimony of a government witness fall short of establishing that the government knowingly used false testimony). "Discrepancies in testimony . . . could as easily flow from errors in recollection as from lies." *Zuno*-Arce, 44 F.3d at 1423.

Despite Petitioner's claims, the inconsistencies and discrepancies in Charlene's statements do not establish that she was lying or that the prosecutor should have known

she was lying, for that matter.  For instance, while Charlene did not mention abuse in April 2011 in her original statement to Officer Demas, that does not mean she lied.  The statement was taken in the hospital and it is possible that she simply did not remember the precise dates at that point.  Her later statement regarding abuse in April 2011 was corroborated by testimony of her roommate, Elena Volta, who stated that Charlene and Davidson's fighting escalated in April 2011.  Volta testified that around that time she heard "arguing and throwing . . . bumping and pounding."  (Lodgment No. 2, vol. 1, ECF No. 33-3 at 190-91.)

Likewise, discrepancies about Charlene's injuries do not establish that her statements to Officer Hernandez and Demas were necessarily false, or that the prosecutor should have known as much.  Dr. Whiting testified that Charlene had extensive bruising to her entire body, including her arms, legs, abdomen and pelvis and that she was the "most severely bruised alive individual that I've seen in my career of taking care of thousands of patients in the emergency department."  (*Id.*, vol. 3, ECF No. 33-7 at 581.)  Even assuming arguendo that Charlene's vaginal bleeding was not the result of Davidson's abuse, there was still an abundance of testimony that she had been severely beaten in the abdomen, torso and pelvic areas.  Likewise, given the extent of Charlene's injuries, Davidson's purported lack of significant hand injuries does establish that Charlene lied about him beating her.  She also stated that he hit her open-handed at times, kicked her and also used a flashlight to beat her.   The differences in the details of Charlene's statements and testimony do not establish falsity, particularly when considered in context of the entire record.  *See Zuno-Arce*, 44 F.3d at 1423; *see also Geston*, 299 F.3d at 1135.

The Ninth Circuit has stated that "[c]ontradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony."  *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991); *cf. Morris v. Ylst*, 447 F.3d 735 744 (9th Cir. 2006) (finding no prosecutorial duty under *Napue* to investigate alleged witness perjury to extent witness

17cv0421 H (MDD)

just changed her story on the stand since defense knew of it and her inconsistent stories were grounds for cross-examination).

In sum, Petitioner's allegations simply do not demonstrate a *Napue* violation because he has not shown that the evidence in question was false or that the prosecutor knew or reasonably should have known it was false. *See Mancuso*, 292 F.3d at 957 (rejecting *Napue* claim where there was no evidence prosecutor presented false testimony); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001) (rejecting claim that prosecution suppressed evidence that witness' testimony was false because petitioner presented no evidence that prosecution knew it was false). Thus, the state court's denial of ground one was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. Accordingly, the Court **RECOMMENDS** the claim be **DENIED.**

### D. <u>Ineffective Assistance of Counsel (ground one)</u>

In ground one, Davidson claims several instances of ineffective assistance of defense counsel, in violation of his Sixth Amendment rights. Specifically, he argues he received ineffective assistance of counsel when defense counsel (1) failed to investigate and raise a motion to suppress statements he made after his arrest, (2) failed to investigate and suppress Charlene's initial statement, (3) failed to call witnesses and present evidence at trial, (4) failed to effectively advise him regarding the prosecution's plea offer, (5) failed to present a viable legal defense, (6) failed to adequately impeach witness testimony and (7) the cumulative effect of counsel's errors amounted was prejudicial. (*See* Pet., ECF No. 1 at 6-23; Traverse, ECF No. 37 at 11-22.)

### *1. State Court Decisions and Exhaustion*

Habeas petitioners who wish to challenge either their state court conviction or the length of their confinement in state prison, must first exhaust state judicial remedies. 28 U.S.C. § 2254(b), (c); *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987). To exhaust state judicial remedies, a California state prisoner must present the California Supreme Court with a fair opportunity to rule on the merits of every issue raised in his or her

federal habeas petition. 28 U.S.C. § 2254(b), (c); *Granberry*, 481 U.S. at 133-34; *see also Duncan v. Henry*, 513 U.S. 367, 365 (1995). If the claim was not presented to the state's highest court on direct appeal, state collateral remedies must be exhausted. *Reiger v. Christensen*, 789 F.2d 1425, 1427 (9th Cir. 1986). For a petitioner in California state custody, this generally means that the petitioner must have fairly presented his or her claims in a petition to the California Supreme Court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (interpreting 28 U.S.C. § 2254(c)); *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999) (applying *O'Sullivan* to California); *accord Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

Davidson raised claims of ineffective assistance of counsel in his petition for writ of habeas corpus filed with the California Supreme Court. (*See* Lodgment No. 17, ECF No. 33-35.) Specifically, Petitioner argued to the California Supreme Court that defense counsel was ineffective in failing to investigate and file a motion to suppress his statement, failing to investigate and suppress Charlene's initial statements to police, failing to call witnesses and present evidence and failing to impeach witnesses. (*See id.* at 25-38.) He also argued he was prejudiced by the cumulative effect of counsel's various deficiencies. (*Id.* at 25.) As such, ineffective assistance of counsel subclaims one, two, five, six and seven presented in Petitioner's federal petition have been exhausted in state court.

Subclaims three and four, however, were not raised in Davidson's petition to the California Supreme Court. Specifically, Davidson did not argue in his state petition that trial counsel was ineffective when she failed to properly advise him regarding a plea offer. Indeed, Davidson acknowledges in his federal petition that this subclaim was not presented to the California Supreme Court. (*See* Pet., ECF No. 1 at 16.) Moreover, Petitioner's subclaim that counsel failed to present a viable legal defense is presented for

/ / /

/ / /

/ / /

the first time in his Traverse[8] and Petitioner failed to raise the claim in his petition to the California Supreme Court.

Where claims have not been presented to the state's highest court, a petitioner may still satisfy the technical requirements of exhaustion if there are no longer state court remedies available to him. *Cassett v. Stewart*, 406 F.3d 614, 621 n. 5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.") (quoting *Coleman v. Thompson*, 501 U.S. 722, 732 (1991)); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.")

Here, based on California's rule barring untimely petitions for post-conviction relief, which the United States Supreme Court has found to be clearly established and consistently applied, it appears that Petitioner no longer has state court remedies available with respect to his federal claims. *See Walker v. Martin*, 562 U.S. 307, 317 (2011) (holding the California's timeliness requirement providing that a prisoner must seek habeas relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied) (citing *In re Robbins*, 18 Cal. 4th 770, 805 (1998) (holding that a habeas claim "that is substantially delayed" will not be considered unless "the petitioner can

---

[8] Because this claim was not presented in the Petition, and the Court has the discretion to consider it or refuse to consider it because Petitioner was specifically warned in this Court's March 10, 2017, Order directing a response to the Petition [ECF No. 6 at 3] that his Traverse "shall not raise new grounds for relief that were not asserted in the Petition." *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (stating that court may ignore issue raised for first time in traverse when scope of traverse has been specifically limited by court order and petitioner ignores order to file a separate pleading indicating intent to raise claim); *but see Boardman v. Estelle*, 957 F.2d 1523, 1525 (9th Cir. 1992) (holding that district court erred in failing to address issue raised in traverse). The Court will, however, exercise its discretion to consider this subclaim.

demonstrate 'good cause' for the delay.")  Because any petition presented by Davidson to the California Supreme Court now, over four years after his conviction, would likely be time barred, the Court therefore finds subclaims three and four are technically exhausted. *See Cassett*, 406 F.3d at 621 n. 5.

The Ninth Circuit has held that claims which are "technically exhausted" are procedurally defaulted if the procedural rule that would be imposed is independent and adequate.  *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011).  Here, however, the Court need not conduct a lengthy analysis to determine whether subclaims three and four are procedurally defaulted because both claims fail on the merits for the reasons discussed below.  *See Lambrix v. Singletary*, 520 U.S. 518, 522-25 (1997) (holding that a federal court need not invariably resolve a state procedural bar issue first where it presents complicated issues of state law and the other issue is easily resolvable against the petitioner); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (finding that it is proper to proceed to merits where procedural bar issue more complicated and result is the same).

### 2.    *Clearly Established Law*

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.

Davidson must also show he was prejudiced by counsel's errors.  *Id.* at 694.  Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).  "The likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).  The Court need not address both the

deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Strickland*, 466 U.S. at 687.

Under the standards of both 28 U.S.C. § 2254(d) and *Strickland*, judicial review is "highly deferential and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted). As a result, "the question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* The *Strickland* prejudice analysis is complete in itself and there is no need for an additional harmless error review under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *See Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), we apply *Strickland's* prejudice standard and do not engage in a separate analysis applying the *Brecht* standard."); *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

### 3. Failure to Investigate and File Motion to Suppress

Davidson claims defense counsel was ineffective in failing to "initiate, much less investigate, any motion to suppress his confession." (Pet., ECF No. 1 at 6.) He claims defense counsel should have obtained records from the UCSD Medical Center, where Davidson was treated after his arrest. Petitioner argues that the medical records show he was cognitively impaired by an overdose of Benadryl when he gave his statement to Officer Bianco. He contends defense counsel's failure to properly investigate and raise a motion to suppress his statements was prejudicial. (*See id.* at 7-13.)

As noted above, Petitioner raised this subclaim in his habeas petition filed with the California Supreme Court. (Lodgment No. 17, ECF No. 33-35.) Because that court denied the summarily denied the petition without comment or citation, this Court must look through to the last reasoned decision to address these claims – that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. The appellate court found Petitioner failed to present sufficient evidence of his ineffective assistance of counsel claims and likewise found the claims to be conclusory. (*See* Lodgment No. 12, ECF No. 33-27 at 2-3.) The court stated that Petitioner "offer[ed] no proof of the validity of [his contentions]." (*Id.* at 2.) The court concluded that Petitioner's "conclusory allegations made without any explanation of their factual bases [we]re insufficient to state a prima facie case or warrant an evidentiary hearing." *Id.* (citing *People v. Duall*, 9 Cal. 4th 465, 474 (Cal. 1995)).

It is clearly established that counsel has a duty to conduct reasonable investigations or to make a reasonable decision that investigation is unnecessary. *Strickland,* 466 U.S. at 691. A decision not to investigate must be assessed for reasonableness under the circumstances at the time, applying a "heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (quoting *Strickland*, 466 U.S. at 690-91). The failure to file a suppression motion is not per se ineffective assistance of counsel, but it may be unreasonable where it is due to a failure to investigate rather than strategic considerations. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). To demonstrate prejudice, Davidson must show that: (1) the motion to suppress would have been meritorious, and (2) there is a reasonable probability that the jury would have reached a different verdict absent the excludable evidence. *Id.* at 375 (1986); *see also Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003).

Davidson argues defense counsel failed to adequately investigate the circumstances of his statement. Specifically, he contends counsel should have obtained the medical records from his hospital visit. As discussed above in section V(A) of this Report and Recommendation, while the hospital records do contain evidence that Davidson was

groggy and confused when he was admitted to the hospital, they are generally consistent with information also contained in Officer Bianco's police report, which defense counsel had obtained. (*See* Pet., Ex. OO, ECF No. 1-4 at 16.) Officer Bianco's report notes that Davidson was initially unresponsive but improved with treatment, after which Bianco obtained Davidson's waiver. (*Id.*) In light of the "heavy measure of deference" afforded a decision not to investigate further, the Court cannot say counsel's failure to obtain the medical records constituted deficient performance. *See Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002).

Even assuming counsel's failure to obtain the records constituted deficient performance, Petitioner has not established prejudice. Officer Bianco acknowledged in his police report that in the ambulance on the way to the hospital, Davidson was "unresponsive to the medic's questions" and made several "incoherent outbursts." (*See* Pet., Ex. OO, ECF No. 1-4 at 16.) Officer Bianco further states in his report that after doctors treated Davidson, he became more alert and responsive. It was only then Officer Bianco admonished Davidson and took his statement. (*Id.*) As discussed above, the UCSD medical records are consistent with Officer Bianco's report. The records indicate that upon admission to the hospital Davidson was confused and groggy and after some time, Petitioner began improve and become more alert. (*See* Pet., Ex. M, ECF No. 1-2 at 113-17.) Thus, although the medical records provide additional detail on Petitioner's condition, Davidson has not shown there is a reasonable probability that the result of his trial would have been different had defense counsel obtained them. *See Strickland,* 466 U.S. at 694. Therefore, the state court's conclusion that Davidson was not prejudiced by counsel's failure to obtain the medical records was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08.

Petitioner also argues that defense counsel's failure to file a motion to suppress amounted to a deficient performance. He points to a declaration from an appellate attorney who briefly represented him. In her declaration, Mary Woodward Wells states

that she asked trial counsel about her decision not to file a motion to suppress Davidson's statement and defense counsel responded that she did not see the benefit of pursuing such a motion.  (Pet., Ex. J, ECF No. 1-2 at 139.)  As discussed above, courts indulge a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687).  This presumption of reasonableness means that not only does the court "give the attorneys the benefit of the doubt," but the court must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).  Here, it appears from evidence Petitioner himself presents that defense counsel considered filing a motion to suppress but determined it would be futile.  To the extent defense counsel declined to file a suppression motion based on her opinion that such a motion would fail, her conduct was not unreasonable.  *See Leavitt v. Arave*, 646 F.3d 605, 611 (9th Cir. 2011) (stating that  decisions about filing motion are strategic decisions, and counsel may reasonably decide not to file a motion where it is likely to lose).  Given the doubly deferential standard under § 2254(d), this Court cannot say that counsel's decision not to pursue a motion to suppress amounted to deficient performance.  *See Richter*, 562 U.S. at 105.

Even assuming arguendo that defense counsel's decision not to file a motion to suppress was unreasonable, Petitioner has not shown prejudice.  As discussed above in sections V(B)-(C) of this Report and Recommendation, Petitioner has not established his *Miranda* waiver was unknowing, unintelligent or involuntary, or that his confession was coerced.  Satisfying the prejudice prong under *Strickland*, "requires showing more than the possibility that [one] was prejudiced by counsel's errors; rather, [one] must demonstrate that the errors actually prejudiced him." *Fields v. Woodford*, 309 F.3d 1095, 1107-08 (9th Cir. 2002).  As noted above, the failure to make a futile motion does not constitute ineffective assistance of counsel. *James*, 24 F.3d at 27.  Here, Davidson has not shown a reasonable probability that, had the motion been raised, it would have been granted.  Furthermore, even he has not established a reasonable probability that the result

of the proceedings would have been different. *See Kimmelman*, 477 U.S. at 375; *Strickland*, 466 U.S. at 694.

In sum, under the highly deferential standards of both *Strickland* and AEDPA, the state court's denial of Davidson's claim that defense counsel was ineffective in failing to investigate and move to suppress his statements was neither contrary to, nor an unreasonable application of, clearly established law. *Strickland*. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. The Court therefore **RECOMMENDS** this subclaim be **DENIED.**

### 4.    *Failure to Investigate and Suppress Charlene's Statement*

Petitioner contends defense counsel was ineffective in failing to investigate and suppress Charlene's statements. (Pet., ECF No. 1 at 11-12.) Specifically, he claims defense counsel "failed to investigate the falsities . . . in [Charlene's] initial statement" and should have moved "to suppress [Charlene's] initial statements to police." (*Id.*) In the last reasoned decision to address this claim, the superior court concluded that Davidson's allegations were conclusory and insufficient to state a prima facie case for relief. (*See* Lodgment No. 12, ECF No. 33-27 at 2.)

As discussed above in section V(C) of this Report and Recommendation, the jury was presented with two versions of events from Charlene. In her initial statements to Officers Demas and Hernandez, given on September 13 and 14, respectively, Charlene stated that she was a victim of domestic violence and that Davidson beat her over the course of several days before she escaped. (*See* Lodgment No. 2, vol. 2, ECF No. 33-5 at 386-88; Lodgment No. 1, vol. 1, ECF No. 33-2 at 49-51, 53-63, 81-82.) At trial, she testified that she lied to officers and that her injuries were in fact the result of consensual BDSM sexual activity. (*See* Lodgment No. 2, vol. 1, ECF No. 33-5 at 139-40; *id.*, vol. 2, ECF No. 33-6 at 320-21, 328-30, 337-40, 354-56.)

Contrary to Petitioner's allegation, defense counsel did point out discrepancies between Charlene's initial statements and her trial testimony. (*See e.g.*, Lodgment No. 2, vol. 4, ECF No. 33-8 at 790-800.) And, as discussed above, it was for the jury to

determine what evidence and testimony to credit or discredit. Furthermore, Charlene's statements to Officers Hernandez and Demas were introduced as prior inconsistent statements under California Evidence Code section 1235. (*See* Lodgment No. 2, vol. 1, ECF No. 33-5 at 234-35.) There was no basis to "suppress" Charlene's statements to the officers and as such, defense counsel's failure to move to suppress them was neither deficient performance, nor prejudicial. *See James*, 24 F.3d at 27 (concluding failure to file a futile motion does not constitute ineffective assistance of counsel).

The state court's denial of Davidson's claim that defense counsel was ineffective in failing to suppress Charlene's statements to Officers Hernandez and Demas was neither contrary to, nor an unreasonable application of, clearly established law. *Strickland*. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. The Court therefore **RECOMMENDS** this subclaim be **DENIED.**

### 5. *Failure to Call Witnesses and Present Evidence*

Davidson argues defense counsel was ineffective in failing to call "nine potential witnesses" and failing to present "six critical pieces of documentation" as evidence. (*See* Pet., ECF No. 1 at 14-15.) In the last reasoned decision to address this claim, the appellate court concluded that Davidson's allegations were conclusory and insufficient to state a prima facie case for relief. (*See* Lodgment No. 12, ECF No. 33-27 at 2.)

### (a) Witnesses

The nine witnesses Davidson argues defense counsel should have called at trial fall into four general categories -- character witnesses, corroborative witnesses, expert witnesses and Petitioner himself. (*See* Pet., ECF No. 1 at 14-15.)

Failure to take steps necessary to produce key witnesses at trial can amount to ineffective assistance of counsel. *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999). However, an attorney is not required to present trial testimony from every witness suggested by defendant. *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987) (trial tactics are clearly within the realm of powers committed to the discretion of defense counsel). To establish prejudice caused by the failure to call a witness, a

petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003). A petitioner's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), amended by 253 F.3d 1150 (2001).

(i) <u>Character Witnesses</u>

Petitioner argues defense counsel was ineffective in failing to call several relatives and a friend to testify as character witnesses. Specifically, he argues defense counsel should have called his brother, Brian Davidson, his sister, Kelly Azaroff, his grandmother, Jacqueline Davidson[9] and his friend, Brandon Brown, to testify at trial as to his good character. (Pet., ECF No. 1 at 14.) In support of his claim, he points to affidavits submitted to the state courts by the proposed witnesses. (*See id.* Exs. G & H, ECF No. 1-2 at 77-89.)

In affidavits submitted to the trial court in August 2013, prior to Petitioner's sentencing hearing, Petitioner's family members asked the trial court for leniency. Petitioner's brother stated in his affidavit that Petitioner was "bi-polar and needs counseling and medication, not a long jail sentence." He stated that Davidson was a "caring person with a big heart" and that Petitioner wanted to "make amends" for his actions. (Pet., Ex. H, ECF No. 1-2 at 88-89.) Petitioner's sister attested that Petitioner was "kind and loving" and aware that he needed medication and counseling to "make a change in his life." She asked the trial court to be lenient when sentencing Davidson. (*Id.* at 86-87.) Finally, in her affidavit to the sentencing court, Petitioner's grandmother

/ / /

_____

[9] Davidson was born to Jaqueline's daughter, Kimberly Gradolph. Jaqueline adopted Davidson as a young child and raised him. (*See* Pet., Ex. G, ECF No. 1-2 at 80-81.)

explained some of Petitioner's history.  (*Id.* at 80-84.)   She noted that Davidson had made some "bad decisions" but was "not a torturer."  (*Id.* at 83.)

Petitioner also submits an affidavit dated March 3, 2016 from his friend, Brandon Brown.  In it, Brown states that he and Petitioner had been friends since 2007 and during that time, he "never witnessed [Petitioner] being violent."  (*Id.*, Ex. G, ECF No. 1-2 at 78.)  Brown further states that had he been called as a witness at trial, he would have testified that Davidson was "not an aggressive person [and] the things he [was] accused of doing are not compatible with the person I know him to be."  (*Id.*)

The failure of trial counsel to call Davidson's family members and friend as character witnesses did not amount to deficient performance.  First, the exculpatory value of the testimony was minimal.  In addition, any testimony Petitioner's family members and friend might have given would be "suspect based on their close relationship with" Petitioner.  *Gonzalez v. Wong*, 667 F.3d 965, 988 (9th Cir. 2011) (holding that trial counsel's failure to present character witnesses who were family members or close friends did not constitute ineffective assistance).

Furthermore, Petitioner has not demonstrated prejudice from trial counsel's failure call the proposed witnesses.  The affidavits show the witnesses offered little more generalized statements that Davidson was a "good person" who needed counseling and medication and deserved leniency.  None of the character witnesses had personal knowledge regarding any of the events leading up to Davidson's arrest.  Petitioner has not shown a reasonable probability that had his brother, sister, grandmother and friend testified as to his good character, the result of the trial would have been different.  *See* *Strickland*, 466 U.S. at 694.  Accordingly, the state court's denial of this subclaim was neither contrary to, nor an unreasonable application of, clearly established law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08.

(ii)   <u>Corroborative Witnesses</u>

Davidson next argues defense counsel should have called Dion Joyce, Greg Rolnick and Jacqueline Davidson as "corroborative" witnesses.  (Pet., ECF No. 1 at 14.)

Joyce had been a neighbor of Petitioner and Charlene. Charlene testified at trial that in August 2011, Joyce was arrested for domestic violence against his wife. According to Charlene, Joyce was jailed for about a week and then released after his wife dropped the charges. After Joyce was released from jail he briefly "crashed" at Davidson and Charlene's house because he had no place to go. (Lodgment No. 2, vol. 1, ECF No. 33-5 at 138-39.)

In his Petition, Davidson argues that Charlene got the idea to falsely accuse him of domestic violence from Joyce's experience. He contends that Charlene lied to officers about the abuse, believing that she could later drop the charges and Petitioner would be released "humbled." (Pet., ECF No. 1 at 14.) Davidson claims defense counsel should have called Joyce to testify in order to show that Charlene's statements to police were fabricated. (*Id.* at 14-15.)

Petitioner has not established deficient performance or prejudice. Davidson offers nothing beyond his own self-serving speculation that Charlene's abuse accusations were somehow tied to Joyce's experience. Charlene testified at trial and was asked about Joyce. Despite testifying that she lied about her abuse, Charlene never suggested any connection between her purportedly fabricated allegations and Joyce's domestic violence history. (Lodgment No. 2, vol. 1, ECF No. 33-5 at 138.) Davidson has presented no evidence beyond his own speculation that Joyce would have been available to testify for the defense or that his testimony would have been helpful the defense. *See Alcala*, 334 F.3d at 872-73.

Furthermore, even assuming Joyce would have been available and would testify as Petitioner suggests, there is no reasonable probability the result would have been different. Joyce would have merely corroborated evidence that was already before the jury. Charlene herself testified at trial about Joyce's domestic violence charges. (*See id.*) She also discussed them in her statement to Officer Hernandez. (Lodgment No. 1, vol. 1, ECF No. 33-2 at 41.) As such, Joyce's testimony would have offered little in additional evidentiary value. Therefore, defense counsel's failure to call Joyce as witness was

17cv0421 H (MDD)

neither unreasonable nor prejudicial.  *See, e.g., Boutte v. Biter*, 556 Fed. Appx. 623, 625 (9th Cir. 2014) ("The absence of evidence that was cumulative of what had already been presented . . . does not undermine our confidence in the outcome.") (quotations and citation omitted); *Matylinsky*, 577 F.3d at 1097 (holding that petitioner "cannot show prejudice for failure to present what is most likely cumulative evidence")

Petitioner next argues defense counsel should have called "Greg Rolnick" as a witness.  Davidson points to a short, hand-written note dated September 14, 2015, that is purportedly from Rolnick, which states, "I have no files farther [sic] back than 2005.  My recollections are vague.  It sounds correct what you say, but I'm sorry I just don't recall that time."  The signature on the note is not clearly legible but appears to be "Gre."  (Pet., Ex. X, ECF No. 1-3 at 31.)  It is unclear from the contents of the note alone, what Davidson contends Rolnick would have testified to or how it would have been helpful to his defense.

An affidavit from Jaqueline Davidson (Petitioner's grandmother), dated March 4, 2016, sheds some light on the matter.  She states that in 1996, Petitioner (who was approximately 9 years old at the time) was visiting his biological mother, Kimberly Gradolph, in Aurora, Colorado.  Gradolph called Jaqueline to complain that she had raised Petitioner poorly.  (*Id.*, Ex. D, ECF No. 1-2 at 53.)  Jaqueline states in her affidavit that she heard Ryan call out for help in the background.  Jaqueline became concerned and called Petitioner's therapist, Greg Rolnick who, in turn, called Aurora Police and child protective services to check on Petitioner.  (*Id.*)

In his own affidavit, Petitioner claims that Gradolph had beat him that day with a flashlight and kicked him so hard she broke her toes.  (Pet., Ex. A, ECF No. 1-2 at 6.)  He alleges he told this story to Charlene, who in turn, used some of the facts as the basis for her own purportedly fabricated abuse allegations.   (*See id.* at 7, 37; *see also* Pet., ECF No. 1 at 12.)  He contends that defense counsel should have called Jaqueline and Rolnick to testify about the 1996 incident as support for his contention that Charlene had lied about her abuse.  (Pet., ECF No. 1 at 12.)

Davidson fails to establish deficient performance or prejudice. The handwritten letter purportedly from Rolnick is not only unverified, it does not even contain a complete signature. Even assuming the letter is from Rolnick, there is nothing in it to suggest Rolnick could have testified as to the events from 1996. The letter indicates that he no longer has records from that time and he states he does not have a recollection of that time. (Pet., Ex. X, ECF No. 1-3 at 31.) To the extent he suggests what Petitioner mentions "sounds right," without any definitive context, the Court has no way to discern what Rolnick is referencing in that statement. Davidson has not provided evidence that Rolnick would have testified, much less that his testimony would have been favorable to the defense. Thus, Davidson has not shown counsel's failure to call Rolnick as a witness was unreasonable or prejudicial. *See Bragg*, 242 F.3d at 1088 (finding a petitioner's mere speculation that, had a witness been interviewed, he might have given helpful information, is not enough to establish ineffective assistance); *see also Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting an ineffective assistance of counsel claim based on trial counsel's failure to interview or call an alibi witness, when there was no evidence in the record that the witness would have testified favorably for the defense).

Likewise, defense counsel's failure to call Petitioner's grandmother to testify as Petitioner's purported abuse in 1996 did not amount to ineffective assistance of counsel. Charlene testified at trial that she used stories Davidson had told her about abuse he had suffered as a child to help her fabricate her own allegations of abuse. (Lodgment No. 2, vol. 2, ECF No. 33-6 at 3266-67.) In response to questioning from defense counsel, Charlene specifically claimed "there were some examples of things that [she] knew about Ryan or maybe from other, other places that [she] interposed to some of the things that were true within the statements." (*Id.*) Thus, because this evidence was already before the jury, Petitioner has failed establish deficient performance or prejudice. *Matylinsky*, 577 F.3d at 1097 (holding that petitioner cannot show ineffective assistance of counsel for failure to present what is likely cumulative evidence).

In sum, the state court's denial of this subclaim that counsel was ineffective in failing to call Joyce, Rolnick and Jaqueline Davidson to testify on his behalf as "corroborative witnesses" was neither contrary to, nor an unreasonable application of, clearly established law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08.

(iii)    Expert Witnesses

Petitioner argues that defense counsel should have called a medical expert to testify regarding records of his treatment at UCSD Medical Center following his arrest. He also contends trial counsel should have called an expert to testify as to the "physical impossibility of [Charlene's] accusations."  (Pet., ECF No. 1 at 14.)

Petitioner has offered nothing beyond his own speculation that such experts would have testified on his behalf.   Davidson suggests that defense counsel should have retained a medical expert to testify that Benadryl left him unable to knowingly waive his *Miranda* rights or provide a voluntary statement.  He points only to an internet article which generally describes symptoms of an overdose of diphenhydramine (found in Benadryl), including confusion, drowsiness, and nervousness, among other things.  (Pet., Ex. Q, ECF No. 1-3.)  Petitioner, however, has not demonstrated that defense counsel could have obtained an expert to provide an opinion that, at the time of his statement to Officer Bianco, he was unable to waive his *Miranda* rights knowingly and intelligently. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (no ineffective assistance of counsel for failing to retain expert where petitioner did not offer evidence that an expert would have testified); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997); (concluding that mere speculation about how an expert might have testified is not enough to establish prejudice).

Davidson's claim that defense counsel should have called an expert to testify as to the "physical impossibility of [Charlene's] injuries" is similarly conclusory and speculative.  Moreover, Petitioner identifies no specific expert witnesses whom counsel should have called, nor does Petitioner provide any evidence in the form of either affidavits or declarations stating whether any such expert witness was willing to testify,

or the facts to which he or she would have testified. He has therefore failed to establish defense counsel was ineffective. *See Dows*, 211 F.3d at 486 (rejecting ineffective assistance of counsel claim based on failure to call witnesses where petitioner presented no affidavit from witness showing that witness was willing to provide helpful testimony to petitioner).

Petitioner has not shown defense counsel's was infective in failing to call medical experts to testify regarding his *Miranda* waiver or Charlene's injuries. *See Strickland*, 466 U.S. at 694. The state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d)(1).

(iv) <u>Davidson</u>

Lastly, Davidson appears to argue that counsel's failure to call him to testify in his own defense amounted to ineffective assistance of counsel. (*See* Pet., ECF No. 1 at 14-15.) He submits an affidavit summarizing what is testimony would have been, had he been called a witness. In it, he states that Charlene's statements and testimony were not truthful, the police officers who testified were not truthful, and that he is innocent of the charges because Charlene consented. (*See generally*, Pet., Ex. A, ECF No. 33-4 at 3-33.)

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987); *Gill v. Ayers*, 322 F.3d 678, 686 (9th Cir. 2003). The right that "stems from several provisions of the Constitution, including the Fourteenth Amendment's Due Process Clause, the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's privilege against self-incrimination." *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir 1999).

"The right is personal, and 'may only be relinquished by the defendant, and the defendant's relinquishment of the right must be knowing and intentional.'" *Id.* (quoting *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)). However, "waiver of the right to testify . . . need not be explicit." *Pino-Noriega*, 189 F.3d at 1094; *Joelson*, 7 F.3d at 177. Rather, "waiver of the right to testify may be inferred from the defendant's conduct

46

and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *Joelson*, 7 F.3d at 177. "When a defendant remains 'silent in the face of his attorney's decision not to call him as a witness,' he waives the right to testify," *Pino-Noriega*, 189 F.3d at 1095 (citation omitted), and to claim ineffective assistance of counsel due to his counsel's failure to call him as a witness. *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993).

Here, after excusing her last witness, defense counsel asked for a five minute recess. After returning and going back on the record, defense counsel stated: "Your Honor, the reason [I] asked for the recess was to make sure Mr. Davidson did not want to testify. He is not going to testify." The Court then asked, "There will not be any other witnesses called for the defense?" Defense counsel replied, "Correct." (Lodgment No. 2, vol. 3, ECF No. 33-7 at 696.) Davidson was present during this exchange. He remained silent, and did not insist on testifying in his own defense or otherwise advise the trial court that he disagreed with the decision. (*See id.*) By staying silent, Davidson waived his right to testify and cannot now claim ineffective assistance of counsel due to trial counsel's failure to call him as a witness. *See Pino-Noriega*, 189 F.3d at 1095; *Nohara*, 3 F.3d at 1244. Accordingly, the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d)(1).

**(b)    Evidence**

Davidson argues that defense counsel was ineffective in failing to present six pieces of evidence: USCD Medical Center records, photos of his injuries, a U.S. Healthworks intake form, a 2013 psychiatric evaluation, a report from Intermountain Hospital, and a transcript from a family court hearing. (Pet., ECF No. 1 at 14-15.)

**(i)    UCSD Medical Records**

As for the UCSD medical records the Court has already addressed counsel's conduct related to the records and Petitioner's statement to Officer Bianco. Petitioner's claim that defense counsel was ineffective in failing to obtain and present Davidson's

UCSD Medical Center records fails for the reasons discussed above in section V(D)(3) of this Report and Recommendation.

### (ii)    Photographs of Davidson

Davidson argues defense counsel should have introduced photographs of his purported injuries, including bite wounds caused by a police dog and a cigarette burn on his hand that he claims was caused by Charlene. (*See* Pet., ECF No. 1 at 17.)

As discussed above, Davidson was apprehended with the assistance of a police dog. Officers arrived at the residence at about 8:19 pm and spent approximately two hours securing the perimeter before entering the residence. (Lodgment No. 2, vol. 2, ECF No. 33-6 at 427-28.) Officer Pimienta testified that law enforcement entered the house along with the canine officer. (*Id.* at 424.) They announced themselves and went room to room, searching for Davidson. Petitioner was ultimately found hiding in an attic crawl space. The canine was released into the space to assist in locating Davison and bringing him out of his hiding space. Officer Pimienta testified that the police dog bit Davidson but she could not recall where, or how many times. (*Id.* at 434, 437.) She also did not notice any injuries to Davidson's hands. (*Id.* at 435.)

Davidson argues defense counsel should have introduced photos purportedly depicting the dog bite injuries and burn on his hand. He appears to argue that the photos would have undermined Officer Bianco's credibility because Bianco had testified that he did not remember seeing any bruising or cuts or scrapes on Davidson's body from dog bites. Officer Bianco also stated he did not remember seeing a cigarette burn on Davidson's hand. (*Id.* at 450-51.)

Failure to introduce the photos did not constitute deficient performance. There was nothing inconsistent about Officer Bianco's testimony. He never denied Davidson had been bitten by the police dog. He merely testified that he did not recall seeing the injuries. In addition, there was little to be gained from showing the photos of the injuries to the jury since they were irrelevant to whether Davidson was guilty of the charges against him. More importantly, it would have served to highlight the fact that Davidson

hid in an attic for two hours to avoid capture, which a jury could reasonably interpret as consciousness of guilt. Thus, defense counsel's decision not to dwell on Davidson's purported injuries was reasonable. *See Strickland*, 466 U.S. at 690; *see also Hensley v. Crist*, 67 F.3d 181, 184 (9th Cir. 1995) (stating "there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation.")

Moreover, the jury had already heard testimony from Officer Pimienta that the police dog bit Davidson. And Charlene testified at trial that she burned Petitioner's hand with a cigarette a "couple days before" Davidson's arrest. (Lodgment No. 2, vol. 1, ECF No. 33-5 at 114, 173-74.) As such, there is no reasonable probability the result of the trial would have been different had defense counsel presenting the photos because the jury had already heard undisputed testimony that the dog bites occurred. *See Matylinsky*, 577 F.3d at 1097 (holding that petitioner "cannot show prejudice for failure to present what is most likely cumulative evidence") Likewise, whether Petitioner had a cigarette burn on his hand or not was of little relevance to the issue before the jury – whether Charlene's injuries were the result of Davidson's abuse or consensual BDSM activities. There is no reasonable likelihood that Davidson would have been acquitted had the jury seen a photograph of the alleged cigarette burn. *See Strickland*, 466 U.S. at 695.

The state court's denial of this subclaim was therefore neither contrary to, nor unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d)(1).

(iii)    U.S. Healthworks Form

Davidson next contends trial counsel should have introduced a form U.S. Healthworks, dated September 10, 2011. (Pet., ECF No. 1 at 14.) The single page form contains general information on Charlene's medical history, medications she had been taking, and her family health history. (Pet., Ex. O, ECF No. 1-2 at 113.) Although it is not clear from the information contained on the document, it appears to be the intake form from Charlene's visit to the hospital to get stitches in her lip. (*See* Lodgment No. 1, vol. 1, ECF No. 33-5 at 119; *see also* Lodgment No. 2, vol. 1, ECF No. 33-5 at 119-20.)

Defense counsel's failure to introduce the document was neither unreasonable, nor prejudicial. The document appears to have little to no relevancy to the ultimate issue -- whether Charlene was injured during consensual BDSM sexual activity or as the result of Davidson's abuse. There was no dispute that Charlene obtained medical attention after cutting her lip – the question, again, was how she was injured. Moreover, the information contained on the form is routine and generally unremarkable.

Davidson appears to claim that the form suggests that Charlene's was untruthful in her statement to Officer Hernandez. Charlene told Hernandez: "Um, he punched me in my stomach and in my groin. Um, I started bleeding that day from my vagina and I told him you know – I think you did that to me. Well I started -- I'm sorry, I started bleeding on Sunday right after that." (*See* Lodgment No. 1, vol. 1, ECF No. 33-3 at 54.) On the intake form, Charlene indicated the date of her last menstrual cycle began, August 16, 2011. (*See* Pet., Ex. O, ECF No. 1-2 at 113.) Based on that information, Petitioner speculates in his own affidavit that the vaginal bleeding Charlene mentioned in her statement to Officer Hernandez was from her monthly menstruation and not from injuries inflicted by Davidson. (Pet., Ex. A, ECF No. 1-2 at 49.)

Even taking Davidson's self-serving speculation at face value, his claim lacks merit. As discussed above, the jury heard testimony regarding Charlene's extensive injuries from several witnesses. Kelly Griffin, the registered nurse who treated Charlene on September 13, 2011, testified that Charlene was "black from bruising on her torso, her arms. She had bruises head to toe." (Lodgment No. 2, vol. 2, ECF No. 33-6 at 481.) She testified that Charlene told her that Davidson had held her against her will for days and repeatedly hit, kicked and beat her with a flashlight. (*Id.* at 482.) Griffin testified on cross-examination that Charlene had significant bruising to her lower abdomen. She had never seen bruising to that extent before. (*Id.* at 488-89.) She stated that Charlene's hands and arms were swollen and note that Charlene's "bruising wasn't just bruises, it was solid black." (*Id.* at 483.)

/ / /

17cv0421 H (MDD)

As discussed above, Dr. Whiting also testified that Charlene had extensive bruising to her entire body, including her arms, legs, abdomen and pelvis and that she was the "most severely bruised alive individual that I've seen in my career of taking care of thousands of patients in the emergency department." (*Id.*, vol. 3, ECF No. 33-7 at 581.) The jury also saw numerous photographs of Charlene's injuries, including those depicting extensive bruising on Charlene's lower abdomen. (*See id.*, ECF No. 33-5 at 132-33.)

Defense counsel's performance was not deficient. During cross-examination, Dr. Whiting testified that he performed CT scans of Charlene's chest abdomen and pelvis to check for internal injuries but found none. (*Id.*, vol. 3, ECF No. 33-7 at 591-92.) Thus, counsel elicited expert testimony which showed there were no internal injuries. There was no need to pursue that matter further, particularly with such speculative evidence. *See Richter*, 562 U.S. at 105. In addition, given Dr. Whiting's testimony regarding the lack of internal injuries, there is no reasonable probability that the result would have been different if defense counsel had attempted to introduce the intake form. *See Strickland*, 466 U.S. at 695. Therefore, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d)(1).

(iv)     Intermountain Hospital Report and 2013 Psychological Evaluation

Petitioner claims defense counsel was ineffective in failing to introduce a 2001 report from Intermountain Hospital and a 2013 psychological evaluation. (Pet., Exs. W & Y, ECF No. 1-2 at 189-90, 195-97.)

The Intermountain Hospital report is dated November 2, 2001, when Petitioner was 14 years old. A nurse practitioner, Janet Graf, who authored had been "asked to consult on [Davidson] for metabolic, neurologic, and endocrine function as well as infectious illness and or trauma that may have precipitated his admission." (Pet., Ex. W, ECF No. 1-3 at 28.) The report also contains general information about Petitioner's mental health treatment at the facility, noting that Davidson had been diagnosed with bipolar disorder

three years prior. (*Id.*) The report states that Davidson reported one incident of physical abuse by his mother when he was 9 years old. Graf summarized that Davidson had a history of physical abuse, acne and mild obesity but was "otherwise normal appearing and physically healthy 14-year-old male." (*Id.* at 29.) Graf concludes that the treatment plan was to "continue medications ordered by the psychiatrist" and ordered labs related to "hepatic, renal or thyroid function." (*Id.*)

The 2013 psychological was performed for Davidson's sentencing hearing. After Petitioner was convicted, he retained new counsel to represent him for his sentencing hearing. His new attorney, in turn, retained a psychologist, Dr. Raymond Murphy, to prepare a psychological evaluation to determine whether Davidson would be amenable to treatment. (Pet., Ex. Y, ECF No. 1-3 at 34.) In his report, dated October 16, 2013, the psychologist concluded that Davidson would be a good candidate for ongoing psychotherapy, that Davidson was "not considered a danger to the community at large," and that he "would have little difficulty on probation." (*Id.* at 35-36.)

Defense counsel was not deficient in failing to introduce either report. The Intermountain report was over 10 years old and contained little to no information relevant to the defense. The 2013 psychological evaluation by Dr. Murphy was not prepared until after Petitioner was convicted. And, like the 2001 report, the contents have virtually no relevance to the issue of Davidson's guilt or innocence. The failure to introduce the evidence was not unreasonable. *See Strickland*, 466 U.S. at 687.

Even assuming the reports would have been admissible at trial, defense counsel's failure to present such evidence was not prejudicial. There is nothing contained in either report that undermines evidence presented by the prosecution that Davidson tortured and assaulted Charlene. Likewise, nothing in either report that supports Davidson's defense that Charlene's injuries were the result of consensual BDSM sexual activity. There is no reasonable probability the result of the trial would have been different had defense counsel introduced the Intermountain Hospital records or the information contained in Dr. Murphy's evaluation. *See id.* at 694.

Accordingly, Petitioner's has not established either deficient performance or prejudice. *Ricther*, 562 U.S. at 105. The state court's rejection of the claim was neither contrary to, nor an unreasonable application of, clearly established law. *See*; *see also Williams*, 529 U.S. at 407-08.

### (v)    Family Court Transcript

Finally, Davidson argues defense counsel should have introduced evidence of Charlene's testimony at a hearing regarding her restraining order against Davidson. (Pet., ECF No. 1 at 14.) Petitioner includes just a single page of the transcript, which appears to be from an April 12, 2012 hearing during which Charlene requested an existing protective order against Davidson be modified or lifted. (Pet., Ex. GG, ECF No. 1-3 at 215.) She told the court that in her original statement in support of a protective order, she "didn't include the fact you know, the fact that I was angry for one thing, about relationship issues. Mr. Davidson had threatened to leave me as well as the relationship and I was angry about that. I also didn't include, about, some of our sexual activities that we had engaged in, which resulted in my injuries as well. It was something I was embarrassed about." (*Id.*) She asked that the restraining order be modified to enable her to communicate with Petitioner, who was then in San Diego County jail awaiting trial, by phone or face-to-face. (*Id.*)

Defense counsel's failure to introduce Charlene's testimony from the restraining order hearing was neither unreasonable no prejudicial. Charlene testified at length at trial about why she gave her original statement and why she later recanted it. She specifically testified at trial that she had lied in her statements to Officers Hernandez and Demas. She stated that she had falsely accused Davison because she was hurt and angry that Davidson had threatened to leave her. (Lodgment No. 2, vol. 1, ECF No. 33-5 at 136-37, 139-41.)

Nothing in the transcript adds anything new that was not introduced through Charlene's testimony. As such, defense counsel's failure to introduce the testimony was neither unreasonable nor prejudicial. *See Carriger v. Lewis*, 971 F.2d 329, 332-34 (9th Cir.1992) (en banc) (concluding counsel's failure to introduce cumulative evidence does

not constitute ineffective assistance of counsel); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (explaining that it was not unreasonable for counsel not to pursue testimony that would be cumulative); *see also United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984) (finding that defendants failed to show prejudice under *Strickland* because evidence was cumulative to testimony of witness called at trial). Therefore, the state court's denial of this subclaim was neither contrary to, nor an unreasonable application of clearly established law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d)(1).

### c. Conclusion

In sum, for the reasons discussed above, the state court's denial of Petitioner's claim that defense counsel was ineffective in failing to call witnesses and present evidence was neither contrary to, nor unreasonable application of, clearly established law. *Strickland*. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. The Court **RECOMMENDS** this subclaim be **DENIED.**

### 6. *Advice Regarding Plea Offer*

Davidson argues that defense counsel was ineffective in failing to advise him to accept a plea offer. (Pet., ECF No. 1 at 16.) He claims that prior to trial, the prosecution offered a prison sentence of six years in exchange for his guilty plea. He alleges he rejected the offer after defense counsel gave him unreasonable advice. (*Id.* at 16-17.) As discussed above, Petitioner failed to present this claim to the California Supreme Court. Because the state court has not considered the merits of this subclaim, this Court reviews the claim de novo. *See Pirtle*, 313 F.3d at 1167.

A criminal defendant is entitled to effective assistance of counsel during plea negotiations. *Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012). Specifically, "a defendant has the right to make a reasonably informed decision whether to accept a plea offer." *See Turner v. Calderon*, 281 F.3d 851, 880 (9th Cir. 2002) (citation omitted). Accordingly, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the

54

accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012). Where counsel did inform petitioner of a plea offer, in order for the petitioner to show that his counsel performed deficiently, he "must demonstrate gross error on the part of counsel" that led to rejection of the offer. *See Turner*, 281 F.3d at 880 (quoting *McMann v. Richardson*, 397 U.S. 759, 772 (1970)); *see also United States v. Day*, 969 F.2d 39, 43 (3rd Cir. 1992) (with respect to counsel's advice during the plea process, it must be shown that "the advice . . . [the defendant] received was so incorrect and so insufficient that it undermined his ability to make an intelligent decision about whether to accept the [plea] offer").

To satisfy the prejudice prong of *Strickland* when a defendant has rejected a plea offer, the "defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 162-63. That is, the defendant "must show that, but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id*. at 164.

Here, Davidson has failed to establish that his decision to reject the plea offer was the result of ineffective assistance of counsel. There is no question that the relevant terms of the plea offer were conveyed to Petitioner -- they were discussed in open court in Petitioner's presence. At the outset of the plea discussions, Davidson stated, "I will plead if the offer will include my freedom." (Lodgment No. 2, vol. 1, ECF No. 33-5 at 14.) In an effort to make sure defense counsel and Davidson understood the offer, the prosecutor stated on the record that there were "two alternative offers [proposed], either count 2 with both allegations, this would be on the amended information, a range of six to ten, sentence to court or count 2 and 3 which would be two strikes, stip six." (*Id.* at 14.) The judge further explained:

/ / /

1
2
3
4
5
6
7
8
9
10
11
12

> And what that means then, if there's one count, which would mean one strike, that follows Mr. Davidson through the rest of his life. An admission to the two allegations and the allegations being that personal – that he personally inflicted great bodily injury on [Charlene] and that he personally used a deadly and dangerous weapon, a metal flashlight, with the top range maximum time that Mr. Davidson can be ordered to serve incarcerated [sic] of ten years. And that would be a decision for the judge. That would be me. That is one way to resolve this case. . . . [¶] The other offer to resolve this case is that Mr. Davidson pleads guilty to Count 2, Count 2 without the allegation . . . [and] Count Number 3 standing alone, without any allegation either, with an agreement, and the Court's agreement as well, that the longest Mr. Davidson would serve in custody for this conduct in this case, afterwards he would be released on parole, would be six years. However, should he reoffend, conduct himself with any criminal fashion during his lifetime he will have what will be known as two strikes on his criminal record. And with the third strike, if he was convicted he could be incarcerated for his life."

13
14
15
16
17
18

(*Id.* at 14-15.) Davidson responded, "Yes sir." (*Id.* at 15.) After the offers were further explained and discussed in open court, defense counsel was given additional time to confer with Davidson privately. (*Id.* at 16.) Once back on the record after their discussion, defense counsel informed the court that Davidson rejected the offer. (*Id.* at 17.)

19
20
21
22
23
24
25
26
27
28

Petitioner now claims that he only rejected the offer "on the advice of counsel, who advised him that it was not in his best interest to accept any plea." (Pet., ECF No. 1 at 16.) Petitioner presents nothing other than his own conclusory statements to support this claim. Before the plea offers were detailed in open court, Davidson himself stated on the record that he would not accept any offer that resulted in prison time. (Lodgment No. 2, vol. 1, ECF No. 33-5 at 14.) After the offers were explained by the court, Davidson indicated that he understood the terms. Petitioner's conclusory allegations, contradicted by the record, are insufficient to support a claim for federal habeas relief. *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations with no reference to the record or other evidence do not warrant habeas relief); *see also Dows*, 211 F.3d at

17cv0421 H (MDD)

486-87 (factually unfounded claim alleging ineffective assistance of counsel presents no basis for federal habeas relief).

Furthermore, even assuming that defense counsel advised Davidson to reject the plea offers, there is no showing that this advice fell below an objective standard of reasonableness. Defense counsel was not required to accurately predict the outcome of a trial. Rather, she was required only to give Petitioner "the tools he needs to make an intelligent decision." *Turner*, 281 F.3d at 881. Here, as discussed above, the prosecution's case relied heavily on how the jury evaluated the victim's credibility. Charlene had recanted her initial accusations against Davidson and was going to testify that she had lied in her statements to police. It was not deficient performance for trial counsel to fail to predict whether the jury would credit Charlene's trial testimony or her initial statements to police and others. *See id.* (stating "[t]rial counsel was not constitutionally defective because he lacked a crystal ball"). As the Ninth Circuit noted in *Turner*, "every rejection of a plea offer, viewed perhaps with more clarity in the light of an unfavorable verdict, could be re-litigated upon the defendant's later claim that had his counsel better advised him, he would have accepted the plea offer." *Id.* Davidson has failed to meet his burden of establishing that his trial counsel's alleged advice to regarding the offered plea agreement was objectively unreasonable.

Petitioner's reliance on *Lafler* is misplaced. In *Lafler*, the performance prong of *Strickland* was not at issue because both parties agreed that counsel had performed deficiently when he advised the defendant to reject a plea offer. *See Lafler*, 566 U.S. at 163. The Court stated: "Here, [ ] the fact of deficient performance has been conceded by all parties. The case comes to us on that assumption, so there is no need to address" exactly what type of performance would be required to find counsel to be constitutionally ineffective. *Id.* The *Lafler* Court did note, however, that "an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance." *Id.* at 174. Here, having concluded that Davidson has not satisfied the performance prong of *Strickland*, there is no need to address the prejudice prong. *See Strickland*, 466 U.S. at

697.   Accordingly, Davidson has failed to establish defense counsel was ineffective when advising him regarding plea agreement.  *See Turner*, 281 F.3d at 880.  The Court **RECOMMENDS** the subclaim be **DENIED**.

### 7.   *Failure to Present Viable Defense*

Petitioner argues that defense counsel was ineffective in failing to present a viable defense.  (*See* Traverse, ECF No. 33 at 11-12.)   As discussed above, Petitioner failed to present this claim to the California Supreme Court.  Because the state court has not considered the merits of this subclaim, this Court reviews it de novo.  *See Pirtle*, 313 F.3d at 1167.

The defense's theory of the case was that Charlene's injuries had been the result of consensual BDSM sexual activity.   Davidson argues, however, that this defense was "functionless" in relation to the charges against him because consent is not a defense to torture or other conduct that results in great bodily injury.  (Traverse, ECF No. 37 at 11.)

It is true that under California law, the charges against Davidson (torture, infliction of corporal injury on a cohabitant and criminal threats) did not include the element of lack of consent.[10]   *See* Cal. Penal Code §§ 206, 273.5, 422; *see also People v. Pre*, 117 Cal. App. 4th 413, 419 (Cal. App. 2001); *People v. Campbell*, 67 Cal. App. 4th 305, 307-08 (Cal. App. 1999); *People v. Toldeo*, 26 Cal. 4th 221, 227-28 (Cal. 2001).   At trial, however, the judge granted defense counsel's request to instruct the jury on mistake of fact and consent as means of negating the specific intent element required for torture, corporal injury of a spouse and criminal threats.  Specifically, the jury was instructed under CALCRIM No. 2406 ("Mistake of Fact") as follows:

/ / /

/ / /

---

[10] In contrast, some criminal offenses in California include lack of consent as an element of the offense. *See People v. Ireland*, 188 Cal. App. 4th 328, 336 (Cal. App. 2010) (stating lack of consent is an element of rape); *People v. Sattiewhite*, 59 Cal. App. 4th 446, 474-75 (Cal. App. 2014) (concluding lack of consent is element of kidnapping); *People v. Andrews*, 234 Cal. App. 4th 590, 602-03 (Cal. App 2015) (stating lack of consent is an element of misdemeanor sexual battery).

The defendant is not guilty of torture, corporal injury to spouse or criminal threats if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact.

If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit torture, corporal injury to spouse or criminal threats.

If you find that the defendant believed that [Charlene] consented to being battered and threatened and if you find that belief was reasonable, he did not have the specific intent or mental state required for torture, corporal injury to spouse or criminal threats.

If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for torture, corporal injury to spouse or criminal threats, you must find him not guilty of those crimes.

(Lodgment No. 1, vol. 1, ECF No. 33-1 at 138; *see also* CALCRIM No. 3106.)

The jury was further instructed: "A person may express consent by words or acts that are reasonably understood by another person as consent. [¶] A person may also express consent by silence or inaction if a reasonable person would understand that the silence or inaction intended to indicate consent." (Lodgment No. 1, vol. 1, ECF No. 33-1 at 139; *see also* CACI No. 1302.)

Contrary to Petitioner's contentions, these instructions were consistent with the theory of the case presented by defense counsel and California law. During closing arguments both counsel argued that the central issue in the case was whether Charlene consented. The prosecutor stated, for instance, "In this case it comes down to which version of events you believe. Do you believe the ones that were initially reported to law enforcement, or the story given by [Charlene] in court over the past couple of weeks?" (Lodgment No. 2, vol. 4, ECF No. 33-8 at 763-64.) In contrast, defense counsel argued that Davidson reasonably believed Charlene consented and as result, Davidson could not have formed the requisite intent to commit torture, corporal injury on a cohabitant, and criminal threats. Defense counsel stated in closing, "Ladies and gentlemen, you have to

17cv0421 H (MDD)

believe that the in-court testimony is the right testimony.  That's why you have to find him not guilty because this was the result of BDSM conduct.  It was the result of [Charlene] saying she wanted it.  And that [defendant] didn't do anything to [Charlene] that she didn't ask for or want."  (*Id.* at 826.)

An attorney does not necessarily render ineffective assistance in choosing one defense theory over another.  *See Mickey v. Ayers*, 606 F.3d 1223, 1238 (9th Cir. 2010).  Here, trial counsel's strategy was reasonable and based on the evidence and the law.  The jury was already being instructed regarding the effect of consent on the specific intent requirement.  Under the instructions, the jury was free to consider the BDSM evidence when deciding whether the prosecution had proven all the elements of the charged offenses beyond a reasonable doubt.  Defense counsel's strategy was to argue that Davidson reasonably believed Charlene consented.  While consent is not a wholesale defense to the crimes charged, defense counsel nonetheless presented a viable defense by making a narrower argument -- that consent negated the specific intent element of the offenses.  Given the facts of the case, particularly Charlene's recantation and subsequent statement that her injuries were the result of consensual BDSM activity, defense counsel's strategy was reasonable.  "[S]trategic choices made after thorough investigation of [the relevant] law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  Accordingly, defense counsel's theory of the defense did not constitute deficient performance.  *See id.*

Furthermore, there is no reasonable probability that had defense counsel employed a different defense strategy, the result would have been different.  A claim of failure to present a viable defense may not be supported solely conclusory allegations, but instead must be supported by a showing that counsel failed to assert a specific, viable defense.  *Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989).  Here, Petitioner argues defense counsel's strategy was ineffective yet he fails to articulate what specific strategy counsel should have adopted instead, or how the outcome of his trial would have been different had she adopted a different strategy.   Davidson has therefore failed to establish

prejudice.  *See Strickland*, 466 U.S. at 694.  Petitioner's claim that defense counsel was ineffective in failing to present a viable defense is without merit and as such, the Court **RECOMMENDS** the subclaim be **DENIED**.

### 8.    *Failure to Impeach Witnesses*

Next, Petitioner argues that defense counsel was ineffective in failing to adequately impeach the testimony of Officers Bianco, Demas, Hernandez and Pimienta.  (Pet., ECF No. 1 at 18-20.)   In the last reasoned decision to address this claim, the appellate court concluded that Davidson's allegations were conclusory and insufficient to state a prima facie case for relief.  (*See* Lodgment No. 12, ECF No. 33-27 at 2.)

Trial counsel's strategy for impeaching a witness involves tactical decisions entitled to deference.  *Dows*, 211 F.3d at 487.  Specifically, "counsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards."  *Id.*; *see also Brown v. Uttecht*, 530 F.3d 1031, 1036 (9th Cir. 2008).  Furthermore, a petitioner alleging ineffective assistance of counsel due to counsel's failure to impeach a witness must demonstrate that, had the witness been impeached in the manner requested by petitioner, there would be a reasonable probability that the verdict would have been different.  *United States. v. Holmes*, 229 F.3d 782, 789-90 (9th Cir. 2000).

### (a)  Officer Bianco

As discussed above, Officer Bianco testified about the statement he took from Petitioner at UCSD Medical Center after Davidson's arrest.  Officer Bianco stated that prior to questioning Davidson, he advised him of his *Miranda* rights and Davidson waived them.  (Lodgment No. 2, vol. 2, ECF No. 33-6 at 441.)  Officer Bianco testified that Davidson told him that he and Charlene had been fighting over the past few days.  Three days earlier, he pushed Charlene during a fight and she cut her chin and needed medical attention.  (*Id.* at 441-42.)  Davidson told Bianco the argument did not end there. It continued after they returned from the hospital and over the next few days.  Officer

17cv0421 H (MDD)

Bianco testified that Davidson stated "I just wanted her to say the relationship was over and she wouldn't do it, so I beat the shit out of her." (*Id.* at 442.)  According to Bianco, Davidson then repeated over and over, "I can't believe I did that." (*Id.* at 443.)

Defense counsel cross-examined Officer Bianco, including the following exchange:

> [Ms. Lacher]:  Do you remember when, in the course of the events of that night, that you actually did the admonishment?
>
> [Off. Bianco]:       Do I remember?
>
> Q:     Yes.
>
> A:     I remember it was at the hospital and after he was being – been treated initially when he arrived.
>
> Q:     Did you attempt to talk to him to see how coherent he was prior to admonishing him?
>
> A:     I was trying to get kind of basic information in the ambulance, but nothing specific regarding the crime.
>
> Q:     And how about at the hospital, where he was being treated, did you attempt to talk to him to determine if there was a level of coherency at some point so you could talk to him?
>
> A:     What do you mean?
>
> Q:     Well, were you asking him questions so you could determine whether or not he might be coherent enough for you to ask him further questions?
>
> A:     Well, he was responding rather appropriately to the medic, like the medical professional's questions.  So at that point I figured he would be able to understand an admonishment.
>
> Q:     So is it – is it your response to my question, no you hadn't talked to him prior to admonishing him?

A:    I may have spoken to him, but I don't remember any specific statements or anything like that.

(*Id.* at 453-54.)

Defense counsel also questioned Bianco about Davidson's physical condition after his arrest, for example:

Q:    Were you able to observe whether or not his clothes were torn from the dog bites?

A:    I don't remember what clothes he was wearing.

Q:    Were you able to see whether or not there was any blood on his clothing from being bitten by a dog?

A:    I don't remember what clothes he was wearing or blood.

Q:    How about any bruising or cuts or scrapes on his body from the dog bites?

A:    I don't remember.

Q:    Did you see a cigarette burn on any one of his hands?

A:    I don't remember.

(*Id.* at 450-51.)

Defense counsel's cross-examination of Officer Bianco did not amount to deficient performance. She attempted to undermine the reliability Davidson's confession by probing Officer Bianco about Davidson's confused mental state prior to the questioning. Defense counsel also asked Bianco about his failure to take contemporaneous notes during the interview, his failure to remember the precise time the statement was taken and other details. Finally, counsel asked Officer Bianco about the Davidson's physical injuries, or lack thereof. In sum, defense counsel's cross-examination of Officer Bianco was not objectively unreasonable. *See Dows*, 211 F.3d at 487.

/ / /

Davidson suggests that defense counsel should have done more by impeaching Officer Bianco with a copy of the UCSD medical records. For the reasons discussed above in sections V(D)(3) and V(D)(5)(b)(i) of this Report and Recommendation, defense counsel was not ineffective in failing to obtain and introduce the medical records. The records were not inconsistent with Bianco's testimony. Bianco admitted that Davidson was somewhat confused and groggy when he was admitted to this hospital. And, as Officer Bianco stated in his report and testimony, he waited until Davidson's condition improved before obtaining his waiver and statement. The medical records similarly indicate that Petitioner's condition was noticeably improved less than an hour after he was initially evaluated. (*See* Pet., Ex. OO, ECF No. 1-4 at 16.) Thus, even if defense counsel had attempted to impeach Officer Bianco with the UCSD medical report, there is no reasonable probability the result of the trial would have been different. *See Holmes*, 229 F.3d at 789-90; *see also Moore v. Marr*, 254 F.3d 1235, 1237-38, 1240-41 (10th Cir. 2001). The states court's denial of this subclaim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d)(1).

### (b)    Officer Demas

Officer Demas took a statement from Charlene shortly after she fled her house and reported Davidson to police. At trial, Officer Demas recounted Charlene's statement, which was not recorded. Officer Demas stated that he originally spoke to Charlene shortly after she had flagged down an officer following her escape. He testified that Charlene was looked nervous and her speech was "frantic." (Lodgment No. 2, vol. 2, ECF No. 33-6 at 382.) She told him she needed help and that she had just escaped from Davidson, who had been beating her. She had visible bruises all over her arms. (*Id.* at 383.)

After 10 to 15 minutes, medics arrived and transported Charlene to the hospital. Officer Demas accompanied her. (*Id.* at 385.) Once at the hospital, Officer Demas resumed the interview. Charlene told him the beatings began around August 20, 2011,

when Davidson had punched her during an argument. (*Id.*) A few days later, the two got into another argument and Davidson kicked her in the legs and face, choked her and backhanded her in the chest and arms. He threatened to kill her and her family if she told anyone or left. (*Id.* at 386-87.)

The battering continued off and on over the next few weeks. She stated that on September 9, 2011, Davidson took her cell phone and keys and refused to let her leave the home. During an argument he beat her with a pink flashlight. (*Id.* at 387.) The next day, September 10, the violence continued and escalated. Davidson punched Charlene in the face, causing a laceration that required stitches. (*Id.* at 388.) Charlene told Officer Demas that she had to call in to work for the following two days because the bruising on her body was so bad. (*Id.*)

Officer Demas testified that Charlene stated that on September 13, 2011, Davidson drove her to a convenience store. When Davidson got out of the car, he told Charlene "Don't go anywhere. I will find you and kill you." (*Id.* at 389.) When Davidson was in the store, Charlene saw a person standing close to the car and mouthed to them "I need help," "call the police," or something to that effect. The person did not respond. Davidson returned shortly thereafter and they went home. (*Id.*) After arriving home, she and Davidson got out of the car. As Davidson was walking ahead of her and Charlene ran away. She approached a neighbor's car that was backing out of their driveway and jumped in, yelling "Go. Go. Go. He's been beating me." The neighbor took Charlene to police. (*Id.*) Charlene told Officer Demas several times that she was scared and had run away because she thought Davidson was going to kill her. (*Id.* at 390.)

On cross-examination, defense counsel questioned Officer Demas about his failure to ask follow-up questions. For instance, counsel questioned Demas about failure to ask Charlene the name of the convenience store Davidson drove her to. She also asked him about his failure to call Charlene's cellphone in order to locate it. (*Id.* at 395.) She pointed out that that Charlene had not mentioned any abuse taking place in April or May

/ / /

2011.  Counsel also pointed to Officer Demas's failure to get specific dates and other details from Charlene.  (*Id.* at 399-401.)  She got Officer Demas to admit that Charlene appeared relatively calm when he spoke to her at the hospital.  (*Id.* at 404.)

Defense counsel's performance was not unreasonable.  She attempted to highlight inconsistencies in Charlene's statement and Officer Demas' failure to explore those inconsistencies when questioning her.  She also attempted to show that police failed to sufficiently investigate and corroborate some of Charlene's allegations.   Given the great deference afforded a defense counsel's tactical decisions, Petitioner has failed to establish defense counsel's performance was deficient.  *See Brown*, 530 F.3d at 1036 (noting deference is afforded to defense counsel's decisions at trial, including whether to cross-examine a particular witness).   Furthermore, Davidson has not shown prejudice.  Davidson fails to identify exactly how, precisely, defense counsel's cross-examination of Officer Demas fell short or show a reasonable probability that the result of the proceedings would have been different if she had done things differently.  *Holmes*, 229 F.3d at 789-90.  The state court's denial of this subclaim was neither contrary to, nor unreasonable application of, clearly established law  *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d)(1).

### (c)     Officer Hernandez

Officer Hernandez took a statement from Charlene on September 14, 2011, the day after Davidson was arrested.  (*See* Lodgment No. 2, vol. 2, ECF No. 33-6 at 508; *see also* Lodgment No. 1, vol. 1, ECF No. 33-2 at 30.)  Officer Hernandez testified that he met Charlene at the Family Justice Center, where she had gone to obtain a restraining order against Davidson.  An audio recording of the interview was played for the jury. (Lodgment No. 2, vol. 2, ECF No. 33-6 at 510; *see also* Lodgment No. 1, vol. 1, ECF No. 33-2 at 31-83.)  Officer Hernandez testified that after the interview, he accompanied Charlene to the residence she and Davidson had shared in order to retrieve the flashlight Davidson had used to beat her.  (Lodgment No. 2, vol. 2, ECF No. 33-6 at 505.)  Finally, he testified about the extent of Charlene's visible injuries.  (*See id.* at 505-08.)

On cross-examination, defense counsel attempted to highlight examples of Officer Hernandez's failure to ask adequate follow-up questions when interviewing Charlene. For instance, she questioned Officer Hernandez about his failure to gather details regarding Charlene's statement that, before her escape, Davidson had driven them both to a convenience store. As she had told Officer Demas, Charlene stated that Davidson ordered her to stay in the car while he went inside the store. (*Id.* at 545.) While Davidson was in the store, she attempted to get assistance from a passerby, to no avail. Defense counsel asked Officer Hernandez if he had attempted to corroborate Charlene's claim by asking her what store it was and investigating further to retrieve any possible surveillance video. He admitted he had not. (*Id.*)

Defense counsel also asked Officer Hernandez several questions about his failure to search for and/or collect evidence that would corroborate details of Charlene's statement when he went with her to the residence to retrieve the flashlight. (*Id.* at 542-44.) For instance, Officer Hernandez admitted that he did not find a pocket knife that Charlene had said Davidson threatened her with. (*Id.* at 542.) Nor did he find the pair of white sneakers Charlene told him Davidson was wearing when she assaulted her in the shower. (*Id.* at 543.) Hernandez also admitted that Charlene told him Davidson had burned her hand but he did not recall seeing any such injury. (*Id.* at 544.) Finally, defense counsel questioned Officer Hernandez about the failure to conduct scientific testing of the flashlight and other items found at the home. (*Id.* at 564-65.)

Defense counsel's performance was not unreasonable. She attempted to undermine the investigation by suggesting several failures to investigate and verify aspects of Charlene's original statement. Counsel also cross-examined Officer Hernandez on the failure of law enforcement to collect and test possible evidence. Given the facts in the case and the great deference afforded a defense counsel's tactical

/ / /

/ / /

/ / /

decisions regarding cross-examination, Davidson has failed to establish deficient performance. *See Brown*, 530 F.3d at 1036; *Dows*, 211 F.3d at 487.

Furthermore, Petitioner has not established prejudice. Davidson argues that defense counsel should have challenged Hernandez's credibility by questioning him about his preliminary hearing testimony that Charlene had accused Davidson of holding a knife to her throat. In her statement to Officer Hernandez, Charlene stated that Petitioner tried to cut her hand (not her throat) with a pocket knife. (Lodgment No. 1, vol. 1, ECF No. 33-2 at 81.) Even assuming defense counsel had pointed out Officer Hernandez's seemingly inaccurate preliminary hearing testimony regarding the pocket knife, there is no reasonable probability the verdict would have been different because the jury acquitted Davidson of the allegation that he had used a knife against Charlene. (*See* Lodgment No. 1, vol. 2, ECF No. 33-2 at 254.) Petitioner thus fails to establish a reasonable probability the result of the trial would have been different had defense counsel attempted to impeach Officer Hernandez with inconsistent testimony regarding the pocket knife. *See Holmes*, 229 F.3d at 789-90.

The state court's denial of this subclaim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d)(1).

### (d)     Officer Pimienta

Officer Pimienta testified that she responded to a call for assistance at Charlene and Davidson's residence. According to the dispatch, Davidson was suspected of felony domestic violence and was believed to be inside the residence. Officer Pimienta assisted other officers in setting up a perimeter. (Lodgment No. 2, vol. 2, ECF No. 33-6 at 424.) After about two hours, Officer Pimienta entered the house, along with other officers, including a canine. They went room to room, searching for Davidson. Ultimately, they found him on the second floor, hiding in an attic crawl space. (*Id.* at 424-25.) The police dog was released to help apprehend Davidson. (*Id.* at 425.)

/ / /

On cross-examination, defense counsel questioned Officer Pimienta about her failure to search for Charlene's cell phone or car keys while in the house. (*Id.* at 429, 431.) She also questioned her about Davidson's confused mental state after his arrest. (*Id.* at 432-33.) In response to defense counsel's questions, Officer Pimienta testified that the police dog had bitten Davidson but she could not recall how many times. (*Id.* at 434.) She also could not recall seeing Davidson had any cigarette burns on Davidson's hands. (*Id.* at 435.)

Davidson argues that defense counsel should have impeached Officer Pimienta with photographic evidence of Davidson's "irrefutable" injuries. (*See* Pet., ECF No. 1 at 19.) As discussed above in section V(D)(5)(b)(ii) of this Report and Recommendation, it was not unreasonable for defense counsel to forgo further questioning Officer Pimienta regarding Davidson's arrest and, specifically, the dog bites. Officer Pimienta acknowledged that the canine officer bit Davidson in an attempt to apprehend him after a two hour stand-off. Defense counsel's decision not to dwell on Petitioner's attempt to avoid capture by hiding in a crawl space was a reasonable tactical decision. *See Brown*, 530 F.3d at 1036 (stating that defense counsel's decision to refrain from asking a particular witness a particular line of questions is entitled to great deference).

Further, whether Officer Pimienta remembered, eighteen months after the incident, precisely where or how many times the canine bit Davidson had little relevance to the ultimate issue at trial. There is no ineffective assistance where defense counsel decides not to impeach a witness over inconsequential matters. *Allen v. Woodford*, 395 F.3d 979, 999 (9th Cir. 2005). As such, Davidson has failed to establish defense counsel's questioning of Officer Pimienta was ineffective and the state court's denial of this subclaim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d).

/ / /

/ / /

/ / /

### e.    Conclusion

In sum, Davidson has not established that defense counsel's cross-examination of Officers Bianco, Demas, Hernandez and Pimiento was deficient or prejudicial. *See Strickland*, 466 U.S. at 690, 694. The state court's denial of Petitioner's claim that defense counsel was ineffective in failing to adequately impeach law enforcement officers who testified at trial was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407-08. The Court **RECOMMENDS** this subclaim be **DENIED**.

### *9.    Cumulative Error*

Finally, Petitioner argues that the cumulative effect of defense counsel's errors amounted to ineffective assistance of counsel. (Pet., ECF No. 1 at 18, 20.) This Court looks through to the last reasoned decision to address this claim -- that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. The appellate court denied the claim, concluding Davidson's allegations were conclusory and insufficient to state a prima facie case for relief. (*See* Lodgment No. 12, ECF No. 33-27 at 2.)

Under the cumulative error doctrine, the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even if each error considered individually would not warrant relief. *See Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (characterizing this principle as clearly established by the Supreme Court). The Ninth Circuit has applied this principle in the context of *Strickland* and has held that prejudice may result from the cumulative effect of multiple deficiencies by counsel. *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995).

Ninth Circuit has observed that "[w]e must analyze each of [petitioner's] claims separately to determine whether his counsel was deficient, but 'prejudice may result from the cumulative impact of multiple deficiencies.'" *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)). The cumulative impact of counsel's errors can give rise to prejudice, particularly where a series of errors prevent the proper presentation of a defense. *Turner v. Duncan*,

158 F.3d 449, 457 (9th Cir. 1998); *see also Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (finding that eleven errors by counsel amounted to cumulative prejudice because they raised a reasonable probability the outcome of trial might have been different).

For the reasons discussed above, Petitioner has identified no deficiencies of counsel which could accumulate. Even if he had, he has not shown that he was prejudiced, individually or cumulatively, by any of the alleged errors. *See Strickland*, 466 U.S. at 694; *Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so."); *see also Pinholster*, 563 U.S. at 181 (holding that those standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt.")

The state court's denial of Petitioner's cumulative error claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407-08; 28 U.S.C. § 2254(d). The Court therefore **RECOMMENDS** the subclaim be **DENIED**.

## E.   Police Misconduct (ground five)

In ground five, Davidson contends his Fourth, Eighth and Fourteenth Amendment rights were violated by police misconduct related to his arrest. He claims officers used excessive force when they apprehended him with the assistance of a police dog. He argues he was curled up in a ball in the attic and no threat to officers when the police canine attacked and bit him. (Pet., ECF No. 1 at 39-40.)

Although Petitioner alleges an excessive force claim under the Fourth, Eighth and Fourteenth Amendments, Davidson's claim is properly brought under the Fourth Amendment, and the Court addresses it as such. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (stating that "claims of excessive force are to be judged under the Fourth Amendment's objective reasonableness standard.") (citation and internal quotation marks omitted); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular amendment

'provides an explicit textual source of constitutional protection' against a particular sort of governmental behavior, 'that Amendment . . .' must be the guide for analyzing these claims.") (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) (concluding that the Eight Amendment applies only to conduct that occurs after conviction).

First, "[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." *United States v. Crews*, 445 U.S. 463, 474 (1980) (citing *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975)). As such, even assuming arguendo that officers used excessive force against Petitioner during his arrest, he is not entitled to federal habeas relief from his subsequent conviction.

Furthermore, Petitioner's claim is barred by *Stone v. Powell*, 428 U.S. 465 (1976). *Stone* bars federal habeas review of Fourth Amendment claims unless the state did not provide an opportunity for full and fair litigation of those claims. Under *Stone,* all that is required is the initial opportunity for a fair hearing. The existence of a state procedure allowing an opportunity for full and fair litigation of Fourth Amendment claims, rather than a defendant's actual use of those procedures, bars federal habeas consideration of those claims. *See Gordon v. Duran*, 895 F.2d 610, 613-14 (9th Cir. 1990) (whether or not defendant litigated Fourth Amendment claim in state court is irrelevant if he had opportunity to do so under California law). California state procedure provides an opportunity for litigation of any Fourth Amendment claim. *See id.* Because Petitioner had an opportunity to fully and fairly litigate it, this claim is not cognizable on federal habeas. The Court therefore **RECOMMENDS** Petitioner's police misconduct claim be **DENIED.**

F.     **Motions for Judicial Notice**

Petitioner has filed three motions for judicial notice. (*See* ECF Nos. 50, 64, 66.) In his first motion, Petitioner the Court to take judicial notice of Exhibit J-1, which was not included with Davidson's initial federal petition or in his state court filings. (First Mot. for Judicial No., ECF No. 50 at 5.) Exhibit J-1 is a declaration from Ashby C.

Sorenson, dated August 18, 2017. In the declaration, Sorenson states that she is an attorney licensed to practice law in California and, having reviewed Petitioner's case, she has concluded that Davidson's trial counsel was ineffective. (*Id.*) She states that trial counsel should have obtained medical records from UCSD Medical Center in order to challenge Davidson's hospital statement to Officer Bianco. She also claims defense counsel was ineffective in "failing to obtain those records as *Brady* material." (*Id.*) Finally, she states that defense counsel failed to inform Davidson that her legal fee was being paid by Charlene, creating a conflict of interest. (*Id.*)

In his second motion, Davidson requests the Court take judicial notice of Exhibit P-1. (*See* Second Mot. for Judicial Not., ECF No. 64 at 2.) That exhibit consists of a declaration from Melissa Beane, dated December 12, 2017. (*Id.*) It was not part of the original petition or included in the record before the state courts. In the declaration, Beane states that she has nine years of experience working as a licensed practical nurse. She states she was retained by Davidson to review the medical records from his September 13, 2011 visit to UCSD Medical Center. (*Id.*) Beane states that based on her medical experience, it is her opinion that it was "inappropriate for anyone to have [Davidson] waive his legal rights or undertake any serious legal endeavor" at the time he was questioned. (*Id.*)

In his third motion, Davidson asks the Court to take judicial notice of his own declaration, signed on January 22, 2018. (*See* Third Mot. for Judicial Not., ECF No. 66 at 2-3.) In it, Petitioner states he cannot afford the $3.00 fee for obtaining a copy of the Local Rules of the United States District Court for the Southern District of California ("Local Rules"). (*Id.* at 2.) He also states that he has been assaulted by fellow prisoners and guards in prison, and denied medical care. (*Id.*) Finally, he claims his sentence was unlawfully changed from seven years-to-life to life without parole. (*Id.* at 3.) He attaches a document from the California Department of Corrections and Rehabilitation

/ / /

/ / /

which states that Davidson was sentenced to "life with parole" but elsewhere on the form states the sentence imposed was "LWOP," a common abbreviation for "life without parole." (*Id.* at 9.)

Judicial notice is governed by Federal Rule of Evidence 201 which concerns judicial notice of adjudicative facts. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201. In other words, "the fact must be one that only an unreasonable person would insist on disputing." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

Documents that are part of the public record may be judicially noticed to show, for example, that a judicial proceeding occurred or that a document was filed in another court case, but a court may not take judicial notice of findings of facts from another case. *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 & n. 5 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 698 (9th Cir. 2001). Nor may the court take judicial notice of any matter that is in dispute. *Lee*, 250 F.3d at 689-90.

As for the declarations from Sorensen and Beale, both contain facts and legal conclusions that are in dispute and therefore judicial notice of the allegations contained in the declarations cannot be taken under Rule 201. *See id.* Moreover, Davidson submits the declarations as support for his claims that his statement was unlawfully obtained and that defense counsel of ineffective assistance of counsel for failure to challenge his statement. These claims were denied on their merits in the state courts and as such are governed by 28 U.S.C. § 2254(d). The Supreme Court's holding in *Pinholster* precludes this Court from considering materials outside the factual record before the state high court when it resolved Petitioner's claims. *Pinholster*, 563 U.S. at 181 (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that

/ / /

/ / /

74

adjudicated the claim on the merits"). Because the Sorensen and Beane declarations were not before the state courts when they resolved Petitioner's claims they cannot be considered here.

As for Davidson's third judicial notice request, it also contains factual allegations that have not been shown to be beyond reasonable dispute.[11] Thus, Davidson's declaration is not appropriate for judicial notice. *See Lee*, 250 F.3d at 689-90. Furthermore, like the declarations of Sorensen and Beane, Davidson's affidavit was not part of the state court record and as such, cannot be considered on federal habeas. *See Pinholster*, 563 U.S. at 181. Therefore, for the foregoing reasons, the Court **DENIES** Petitioner's three requests for judicial notice. (ECF Nos. 50, 64, 66.)

### G. <u>Motions for Evidentiary Hearing</u>

In a series of motions and supplemental motions, Davidson asks this Court to conduct an evidentiary hearing on his claims. (*See* ECF Nos. 43, 55, 57, 71, 73, 75.) In his first motion, Petitioner requests a hearing in order to present additional "new evidence" that Charlene's initial statements accusing him of domestic abuse were false. (*See* First Mot. for Evid. Hrg., ECF No. 43.) Davidson attaches a letter Charlene purportedly sent him in prison in July 2017 which he suggests contain false allegations against a man Charlene dated sometime in late 2016. (*See id.* at 3-4, 11-12.) He claims the letter illustrates that Charlene has a "propensity to lie" and make "false allegations against men who upset her." (*Id.* at 4.)

/ / /

/ / /

---

[11] The Court notes that the allegations contained in it are unrelated to the claims contained in the Petition. To the extent Petitioner seeks to pursue claims related to conditions of his confinement, typically a § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life. *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973); *Heck v. Humphrey*, 512 U.S. 477, 480-85 (1994). The Court further notes with respect to Petitioner's sentence, the trial court record clearly indicates Petitioner was sentenced to an indeterminate life term plus 5 years, with the possibility for parole. (*See* Lodgment No. 1, vol. 1, ECF No. 33-1 at 199-202; *see also* Lodgment No. 2, vol. 8, ECF No. 33-12 at 974-75.)

In a supplement to his first motion, Davidson points to two additional pieces of evidence. First, he offers a "Declaration of Disclosure" form from San Diego Superior Court, signed by Charlene, seemingly related to Petitioner's request to nullify their marriage. (First Mot. for Evid. Hrg. Supp., ECF No. 55 at 9-10.) In it, Charlene states she was a victim of domestic violence committed by Davidson. (*See id.* at 10.) Petitioner claims the declaration shows that Charlene has a pattern of making false allegations against him whenever he attempts to break ties with her – in this case, by seeking to dissolve their marriage. (*Id.* at 4.)

In the same supplement, Davidson also attaches a declaration from "Damean Brown," who is apparently a fellow inmate. In the declaration, Brown states that he reviewed trial transcripts and photographs purportedly of Davidson's hands showing "no knuckle injury." (*Id.* at 11.) Based on his prior experience as a boxer, Brown concludes the lack of injuries to Petitioner's hands suggest it was physically impossible for him to have punched Charlene as she claimed in her interview with Officer Hernandez. (*See id.* at 6, 11.)

Davidson repeats similar arguments in his second motion for evidentiary hearing, again pointing to Brown's declaration and photos purportedly depicting his uninjured hands. (Second Mot. Evid. Hrg., ECF No. 57 at 2-3, 5.) Respondent has filed two briefs in opposition to Davidson's first and second motions.[12] (*See* ECF Nos. 58, 60.)

Davidson filed third and fourth motions for an evidentiary hearing on April 30, 2018 and May 7, 2018, respectively. (ECF Nos. 71, 73.) In the third motion, Davidson seeks an evidentiary hearing to present evidence that he is "actually innocent" of punching Charlene in the stomach in such a way as to cause vaginal bleeding. (Third Mot. Evid. Hrg., ECF No. 71 at 2.) He points to a declaration from "Jill Robinson" who

---

[12] This Court previously denied Petitioner's first two motions as premature, concluding they would be more appropriately considered as part of its Report and Recommendation on the merits. (*See* ECF No. 63.)

states, based on her personal experience, the vaginal bleeding Charlene mentioned in her statement to Officer Hernandez was likely due to her menstrual cycle. (*See id.* at 14.) He contends this evidence supports his claim that defense counsel was ineffective. (*Id.* at 6.)

In his fourth motion, Petitioner requests a hearing to introduce "newly developed evidence of []his innocence." (*See* Fourth Mot. Evid. Hrg., ECF No. 73 at 4; *see also* ECF No. 75.)[13] Davidson includes a report regarding x-rays taken of his feet on March 30, 2018. The report concludes that the bones of both fee "appear intact, with no evidence of fracture, dislocation, or subluxation." (ECF No. 75 at 9.) He argues that the recent x-rays show he has "no symptoms of past bone breakages or injuries" to his feet. He argues this shows that he did not kick Charlene with such force to injure his feet or toes. He also claims this supports his claim that defense counsel was ineffective for not obtaining and presenting evidence that showed his feet were uninjured after his arrest. (*Id.* at 6.)

Petitioner's multiple requests for an evidentiary hearing are foreclosed by the Supreme Court's decision in *Pinholster*, 563 U.S. 170. There, the Supreme Court held that where habeas claims have been decided on their merits in state court, a federal court's review under 28 U.S.C.§ 2254(d)(1) -- whether the state court determination was contrary to or an unreasonable application of established federal law -- must be confined to the record that was before the state court. *Pinholster*, 563 U.S. at 181-82. The Court specifically found that the district court should not have held an evidentiary hearing regarding Pinholster's claims of ineffective assistance of counsel until after the Court determined that the petition survived review under section 2254(d)(1). *Id.*; *see also Gonzalez v. Wong*, 667 F.3d 965, 979 (9th Cir. 2011).

/ / /

---

[13] In his June 5, 2018 request for copies and judicial notice, Davidson contends the document filed as ECF No. 73 was missing exhibits, including a copy of an x-ray report. (*See* ECF No. 77.) Davidson submitted a second copy of the motion, also filed on June 5, 2018, which includes the pages which were apparently missing from ECF No. 73. (*See* ECF No. 75 at 9.)

17cv0421 H (MDD)

Here, Petitioner seeks an evidentiary hearing in order to introduce evidence to support claims that were denied on the merits by the California Supreme Court – in particular, claims that defense counsel was ineffective and that the prosecution introduced false testimony and evidence. And for the reasons discussed in Section V(D) of this Report and Recommendation, Davison's claims do not survive review under section 2254(d). The Ninth Circuit has stated that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief." *Sully v. Ayers*, 725 F.3d 1057, 1075-76 (9th Cir. 2013). Accordingly, Davidson's motions for an evidentiary hearing are **DENIED.**

## H.    Request for Copies and Judicial Notice of Clerical Errors

Finally, on June 5, 2018, Davidson filed a "Request for Copy of Local Rules and ECF Documents, Motion for Judicial Notice of Clerical Errors, and for Curative Action." (ECF No. 77.) In it, Davidson asks the Court to provide him with a copy of the Local Rules free of charge. He further requests "copies of every ECF document scanned in this case be printed and provided [to him] to review for errors." (*Id.* at 1.) He alleges that a previous motion was improperly scanned and as a result, the document was entered on to the docket with pages missing. (*Id.* at 4-6.) He also contends that his access to courts is being hindered by filing documents pursuant to a "Discrepancy Order." (*Id.* at 5-6.) Lastly, Petitioner requests the Court take judicial notice of the facts alleged in the points and authorities in support of his motion, in which he alleges his Fourth Motion for Evidentiary Hearing (ECF No. 73) was improperly scanned and docketed with pages missing. (*Id.*)

Davidson is not entitled to have the Court provide photocopies for him free of charge. *See Sands v. Lewis*, 889 F.2d 1166, 1169 (9th Cir. 1990) (per curiam) (overruled on other grounds by *Lewis v. Casey*, 518 U.S. 343, 350-55 (1996)) (stating that prisoners have no constitutional right to free photocopy services). The statute providing authority to proceed in forma pauperis, 28 U.S.C. § 1915, does not include the right to obtain court documents without payment. Plaintiffs proceeding in forma pauperis cannot receive free

copies of documents from the court without demonstrating a specific showing of need. *See e.g.*, *In re Richard*, 914 F.2d 1526, 1527 (6th Cir. 1990) (stating that 28 U.S.C. § 1915 "does not give the litigant a right to have documents copied and returned to him at government expense"); *see also Jones v. Franzen*, 697 F.2d 801, 803 (7th Cir. 1983) ("[B]road as the constitutional concept of liberty is, it does not include the right to xerox."). As a general rule, the Court is not authorized "to commit federal monies for payment of the necessary expenses in a civil suit brought by an indigent litigant." *Tabron v. Grace*, 6 F.3d 147, 159 (3d Cir. 1993); *see also Tedder v. Odel*, 890 F.2d 210, 211 (9th Cir. 1989) (28 U.S.C. § 1915 does not waive costs of litigation other than filing of the complaint and service of process).

Petitioner claims he needs a copy of the Local Rules because previous documents have been filed pursuant to "discrepancy order." He argues the Clerk's Office staff have improperly found documents to be in violation of the Local Rules. Petitioner points to ECF numbers 17, 25, 70, 72 as examples. Although discrepancy orders were issued for those documents, all but one were nonetheless accepted and filed by the Court. (*See* ECF Nos. 18, 71, 73.) With regard to ECF number 25, "Motion for Appointment of Expert Witness," the document was properly rejected for filing. Petitioner had previously filed a motion for appointment of an expert witness. (*See* ECF No. 14.) This Court denied the motion as premature because Respondent had not yet filed a responsive pleading. (*See* ECF No. 20.) After the Answer was filed, Petitioner filed two motions for appointment of expert witness. (ECF Nos. 38, 40.) This Court considered both motions and denied them on September 1, 2017. (ECF No. 41.) Petitioner has not been prevented from filing documents with the Court. As such, he has not shown a need for a free copy of the Local Rules. *See Richard*, 914 F.2d at 1527.

Davidson further requests the Court send him copies of "every document" he has filed in this case, so that he may review them for "error." He states that his Fourth Motion for Evidentiary Hearing, filed on May 7, 2017, was improperly scanned and docketed with pages missing. He claims that he must review all the documents filed in

order to determine if there have been other "errors."  Assuming Petitioner's fourth motion for evidentiary hearing was missing pages, Petitioner has now submitted a complete copy of the document and this Court has reviewed it above.   Moreover, this Court has reviewed all of the documents submitted in this case and no other documents appear to be missing pages.  Thus, Petitioner has not shown a need for copies of every document filed. *See Richard*, 914 F.2d at 1527.

Finally, Petitioner asks this Court to take "judicial notice" of the two documents entitled "Fourth Motion for Evidentiary Hearing." (ECF Nos. 73, 75.)  All the documents filed in this case are part of the record, including ECF Nos. 73 and 75.  There is no need to take judicial notice of them.  Furthermore, to the extent Petitioner requests the Court take judicial notice of additional factual allegations contained in his points and authorities, the request is denied.  *See Lee*, 250 F.3d at 689-90.  Therefore, Petitioner's motion for copies and for judicial notice is **DENIED**.

## VI.  CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Marilyn L. Huff under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.   For the reasons outlined above, the Court **DENIES** Petitioner's motions for judicial notice (ECF Nos. 50, 64, 66) and **DENIES** Petitioner's motions for an evidentiary hearing (ECF Nos. 43, 55, 57, 71, 73, 75).  The court **DENIES** Petitioner's request for copies.  (ECF No. 77.)

In addition, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **June 22, 2018**. The document should be captioned "Objections to Report and Recommendation."

/ / /

/ / /

**IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than **July 6, 2018**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:   June 8, 2018

Hon. Mitchell D. Dembin
United States Magistrate Judge

17cv0421 H (MDD)