# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN PATRICK DAVIDSON,<br><br>                                    Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary of the California Department of Corrections and Rehabilitation,<br><br>                                    Respondent. | Case No.:  3:17-cv-00421-H-MDD<br><br>**ORDER:**<br><br>**(1) DENYING PETITION FOR A WRIT OF HABEAS CORPUS;**<br><br>**(2) ADOPTING REPORT AND RECOMMENDATION AND AFFIRMING THE DENIAL OF MOTIONS; and**<br><br>**(3) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**<br><br>**[Doc. Nos. 78, 83, 85, 87, 89.]** |

On February 27, 2017, Petitioner Ryan Patrick Davidson, a pro se prisoner at the California Correctional Institution in Tehachapi, California, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his six convictions for: (i) torture, Cal. Penal Code § 206; (ii) corporal injury to a spouse or roommate, Cal. Penal Code § 273.5(a); and (iii) making a criminal threat, Cal. Penal Code § 422.  (Doc. No. 1.)  On June 8, 2018, the Magistrate Judge issued a Report and Recommendation recommending

that the Court deny all relief.  (Doc. No. 78.)  Petitioner filed objections to the Report and Recommendation on July 5, 2018, (Doc. No. 81), and Respondent elected not to reply.  For the reasons that follow, the Court adopts the Report and Recommendation as supplemented by the reasoning in this Order, dismisses the petition, denies all pending motions, and declines to issue a certificate of appealability.

## **Background**

## I.     **Offense Conduct**

The California Court of Appeal described the facts relevant to Petitioner's case as follows:

> The charges in this case arose from [Petitioner's] highly assaultive conduct on his girlfriend (CC) over a period of several months.  On September 13, 2011, CC fled from defendant and reported the domestic violence to a neighbor, her family, emergency room personnel, and police, including during a recorded interview.  By the time of trial, CC had recanted, claiming she consented to the infliction of injuries as part of a consensual BDSM (bondage, dominance, sadism, and masochism) relationship with [Petitioner].  The trial court instructed on the defense theories of accident and reasonable belief in consent. The jury rejected the defense claims and found defendant guilty.
>
> [Petitioner] and CC started dating in 2008 and shortly thereafter [Petitioner] moved in with CC.  CC's roommate, who rented the upstairs area of her home to CC, testified she sometimes heard a lot of yelling, screaming, arguing, bumping, pounding, slapping, and things being thrown from CC's portion of the house.  She heard [Petitioner] and CC arguing more frequently in about April 2011, and again in September 2011, and during this period they started "more and more . . . keeping to themselves."  In the days before September 13, 2011, she heard defendant say in an irate voice, "I can't understand why I have to keep telling you this over and over and over."  CC's parents testified they noticed bruises on CC's face, neck, and arm during this timeframe, and CC variously said they were caused by a fall or because she had "cheated" on [Petitioner].
>
> On September 13, 2011, CC's neighbor and the neighbor's son were in their car when CC ran out of her residence and jumped into the back seat.  CC was crying, frantic, and repeatedly screaming "Get me out of here."  CC told them her boyfriend had been beating her with a flashlight; he had been beating her for hours; and he had threatened her family and friends.  CC showed them her

arms, which were covered in bruises.

When fleeing her residence, CC did not have her cell phone, purse or keys, and she used her neighbor's cell phone to warn people about [Petitioner's] threats. CC left a message telling her roommate not to come home. She told her parents to get out of the house "right now"; [Petitioner] had her phone and her car; and he was going to kill them and all of her friends. CC's parents called 911 and fled their home.

Meanwhile, the neighbor assisted CC in contacting the police, and CC was transported by ambulance to the hospital. CC told the emergency room personnel her boyfriend had held her against her will for days and beaten her; he beat her with a flashlight, kicked her, and choked her; he hit her "multiple times in the same areas"; she was very afraid of him; and they had consensual sex but she wished "the domestic violence would just end." The emergency room personnel observed extensive bruising throughout her body, including on her face, neck, extremities, torso, abdomen, and pelvic area; a perforated ear drum; two bite marks (on her leg and chest); and a previously stitched lip laceration. The emergency room nurse testified CC's bruising from her shoulders to her elbows was "solid black, which [the nurse had] never seen before"; her arms, hands and jaw were swollen; she had a "hard time moving"; and she complained of pain from "head to toe," including ear pain. The emergency room physician testified CC was "the most severely bruised alive individual" he had seen in his career; her injuries were from "some form of blunt force"; the bruising pattern was "consistent with injury that has occurred over time"; the bruises could have been incurred within 48 hours to one or two weeks earlier; and the extent of the bruising required evaluation for internal injuries including blood tests, X-rays, and CT scans.

CC provided details about what occurred during two police interviews, and the second interview was recorded. CC explained [Petitioner] was "emotionally unstable" and could "turn[ ] on a dime" if she "answer[ed] something wrong," and [Petitioner's] mother claimed he was bipolar. [Petitioner] started hitting her in April 2011, and the assaults continued on and off in May, June, and August 2011. During the arguments he would hit her and then they would talk, he would apologize, and it would be "okay" until they had another fight. In May [Petitioner] hit her "really badly." He bit her on her cheeks, slapped her face, and choked her. When CC asked why he was hitting her, he would tell her she was hurting him "on the inside"; she was not listening and it was her fault; and he wanted to help her be a better person. When they talked after their fights, they would have consensual sex, and she

3

would ask herself how she could be intimate with someone who was hitting and hurting her, but she always thought [Petitioner] loved her and really did want to help her.

The assaults that culminated in CC's escape on Tuesday, September 13 occurred on and off from Saturday to Tuesday. On Saturday [Petitioner] hit her with his fist, his shoe and a metal flashlight; kicked her; threw a bottle at her; choked her; hit her in the ears; and punched her in the stomach and vagina. When she told him to stop, he said, "You're begging me? I begged you to stop hurting me and now you are begging me and you want me to stop?" She tried to deflect his blows by putting up her hands and covering her chest and abdomen, which would make him angrier and worsen the attack. [Petitioner] told her, "I'm just gonna kill you. I'm gonna scoop your fucking eyes out of your head so you don't have to see the rest of the world. The rest of the world can just see how fucking ugly you are." At one point on Saturday he cut her lip "wide open." When she told [Petitioner] she thought she needed stitches, he took her to urgent care, where she told the staff that she had gotten into a fight with her "bipolar cousin."

[Petitioner] became angry again on Sunday, and he kicked and punched her while she was in the shower. On Monday she called her boss and said she would be working from home on Monday and Tuesday. During a fight on Monday that lasted about two hours, [Petitioner] pushed, hit, and strangled her.

On Tuesday, when something she said displeased him, [Petitioner] put a towel under the door so no one could hear, and he "started really wailing" on her. He "continuously" hit her with his fists, hit her with the metal flashlight, kicked her, threatened to kill her, tried to cut her hand with a knife until she was able to twist her hand away, and held a flame to her hand. He told her, "It would bring me no greater pleasure than to take everyone away from you [CC]. To take them apart piece by piece in front of you. You watch them suffer and then I'll take you and then I'll kill you." He saw how swollen her arms were, and he said, "I'm gonna hit them. I'm gonna keep on hitting them until they split open. And when they split open [CC], I'm going to keep on hitting you after that. And then I don't know what I'm gonna . . . do. I really wanna kill you and leave you here so that nobody can help you and I'll just take off." At this point CC thought, "Okay, he's really going to kill [me]." She was finally able to escape when they left the house for an errand and then returned. Upon their return, she "lagged behind" [Petitioner] as they approached their residence. When he went inside the house, she slammed the

door shut from the outside and ran to the neighbors who were in their car.

The same day that CC fled, [Petitioner] was arrested at their residence. The police found him hiding in an attic crawl space. [Petitioner] told the police that he and his girlfriend had been arguing for several days and they got into a physical fight. He said that during the argument, "I just wanted her to say the relationship was over and she wouldn't do it, so I beat the shit out of her"; "I can't believe I did that."

A prosecution mental health expert testified about common domestic violence patterns, including the not uncommon occurrence of recantation by the victim.

*Defense*

CC married [Petitioner] while he was in jail for the current charges. At trial, she claimed [Petitioner] never physically abused her and never physically assaulted her without her consent. She testified she had "a lot of issues with things about emotional pain"; she was a "pain slut"; she self-mutilates by putting cigarettes out on herself to release overwhelming emotions; she became interested in BDSM at about age 19; before she met [Petitioner] she engaged in consensual BDSM practices with a man she met on the Internet; and BDSM "releases emotional stuff." She eventually told [Petitioner] about her past and her need for BDSM. In 2011 they began engaging in BDSM practices, including "gang rape play," "rope bondage," branding, choking, spanking, hitting, kicking, and use of riding crops, belts, a flashlight, and other implements. These practices resulted in bruising of CC; the bruises were "like a badge of honor" to her; and they had a "safe word" for her to use if she wanted him to stop.

CC testified some of her injuries, including the cut on her lip, resulted from an accidental fall that occurred when a rope came undone during their BDSM activity. She stated her bruising was the result of their BDSM activity; she asked [Petitioner] to inflict the bruising and wanted him to do so; and she "made him do more and continue" even when he did not want to and did not like seeing her in a bruised state. She claimed her parents "made" her report her injuries to the authorities and obtain a restraining order; she had not wanted to do this; and she lied about [Petitioner] physically abusing her and threatening to kill her and her family because she was angry at him and when she gets angry she "kind of explode[s]."

To support CC's claims of consensual BDSM activity, the defense presented

testimony from CC and a computer forensics expert to show that CC had accessed websites concerning BDSM activity, and from two experts who provided opinions about BDSM and the evidence in the current case. A defense mental health expert testified CC met the criteria for "masochistic paraphilia based on her sexual excitement and reoccurring fantasies about being humiliated, hurt, and bound, and that this caused her . . . physical injuries."

People v. Davidson, No. D064880, 2015 WL 4751166, at *2–4 (Cal. Ct. App. Aug. 12, 2015) (internal quotation marks and footnotes omitted). These facts are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).

## II. Procedural History

In February of 2013, a jury found Petitioner guilty of: (i) one count of torture, Cal. Penal Code § 206; (ii) four counts of causing corporal injury to a spouse or roommate, Cal. Penal Code § 273.5(a); and (iii) one count of making a criminal threat, Cal. Penal Code § 422. (Doc. No. 33-3, Probation Officer's Report, at PageID 970.) The San Diego County Superior Court sentenced Petitioner to life in prison with the possibility of parole, plus a determinate term of five years. (Id. at PageID 1019–22.)

Petitioner appealed his conviction and sentence to the Fourth District Court of Appeal. On August 12, 2015, the Court of Appeal rejected Petitioner's claims of instructional error and abandonment by counsel, but agreed that the trial court had improperly imposed a domestic violence fine, and thus affirmed the judgment with modifications. Davidson, 2015 WL 4751166, at *9. The California Supreme Court summarily denied Petitioner's petition for review on November 12, 2015. (Doc. No. 33-18.)

On May 16, 2016, Petitioner filed a petition for a writ of habeas corpus in the Superior Court, arguing that: (i) his Miranda rights had been violated; (ii) the prosecutors knowingly presented false testimony at his trial testimony; and (iii) his trial counsel was ineffective in several respects. (Doc. No. 33-20.) The Superior Court denied the petition on July 7, 2016, finding that Petitioner's Miranda claim was procedurally barred, and

denying the remaining claims on the merits.  (Doc. No. 33-25.)

Petitioner subsequently re-raised the same claims in a habeas petition filed before the Court of Appeal.  That court denied each of Petitioner's claims on the merits in a reasoned opinion.  (Doc. No. 33-27.)

On October 1, 2016, Petitioner filed a second habeas petition before the Superior Court, raising the same claims for a third time.  The Superior Court denied the claims as repetitive.  (See Doc. No. 33-30 (citing In re Lynch, 8 Cal. 3d 410 (1972), and In re Miller, 17 Cal. 2d 734 (1941)).)  Petitioner then filed a second habeas petition before the Court of Appeal, re-raising his earlier claims, and arguing for the first time that his confession was involuntary and that the police committed misconduct during his arrest and questioning.  (Doc. No. 33-31.)  On November 4, 2016, the Court of Appeal rejected Petitioner's claims as either repetitive, or untimely.  (Doc. No. 33-34.)  The California Supreme Court summarily denied all relief on January 11, 2017.  (Doc. No. 33-38.)

On February 27, 2017, Petitioner filed the instant petition, which re-asserts the same claims that were denied multiple times by the California courts.  (Doc. No. 1.)  Respondent answered the petition on June 27, 2017.  (Doc. No. 32.)  Petitioner filed a Traverse on August 21, 2017, (Doc. No. 37), and subsequently filed several related motions.  (Doc. Nos. 44, 50, 55, 57, 64, 66, 71, 73, 75, 77.)

On June 8, 2018, the Magistrate Judge issued a Report and Recommendation denying Petitioner's motions, and recommending that the Court deny the petition.  (Doc. No. 78.)  Petitioner filed objections to the Report and Recommendation on July 5, 2018 (Doc. No. 81), and Respondent elected not to reply.

### III.    Standard of Review

Petitioner's claims are governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  See 28 U.S.C. § 2254.  Under AEDPA, a federal district court may grant a writ of habeas corpus to a state prisoner only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); accord Swarthout v. Cooke, 562 U.S. 216, 219 (2011) ("[F]ederal habeas corpus relief does not

lie for errors of state law." (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991)) (internal quotation marks omitted)).

Accordingly, "[a]n application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Review under § 2254(d)(1) is intentionally "difficult to meet," Harrington v. Richter, 562 U.S. 86, 102 (2011), and "limited to the record that was before the state court that adjudicated the claim on the merits," Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

"[Section] 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.'" Bell v. Cone, 535 U.S. 685, 694 (2002); see Williams v. Taylor, 529 U.S. 362, 404-05 (2000) (distinguishing the "contrary to" and the "unreasonable application" standards). In short, a state-court ruling is "contrary to" clearly established Federal law if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." Williams, 523 U.S. at 412-13. Moreover, a state-court ruling constitutes an "unreasonable application" of clearly established Federal law when it applies the correct principle articulated by Supreme Court precedent to the facts of a petitioner's case in an unreasonable manner. Id. at 413.

In order for a federal court to grant a writ of habeas corpus pursuant to the "unreasonable application" prong, "the state court's decision must have been more than incorrect or erroneous." Wiggins v. Smith, 539 U.S. 510, 520 (2003). Instead, the state court's application of the relevant precedent must have been objectively unreasonable. Id.; Lockyer, 538 U.S. 63, 76 (2003); see also Harrington, 562 U.S. at 100 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.").

"Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed

to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" Lockyer, 538 U.S. at 71 (quoting Williams, 529 U.S. at 412); see also Parker v. Matthews, 567 U.S. 37, 48 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").

In determining whether to defer to a state court's denial of a habeas petitioner's claims, the Court reviews the reasoning of the last state court to have denied the claims on the merits. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). In this case, the California Supreme Court denied Petitioner's claims without explanation. (Doc. Nos. 33-38.) The Court must thus "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." Wilson, 138 S. Ct. at 1192. The Court therefore focuses its attention on the California Court of Appeal's two opinion denying some of Petitioner's habeas claims on the merits, and others on procedural grounds. (Doc. Nos. 33-27, 33-34.)

### Discussion

After reviewing Petitioner's arguments, the record in this case, and the relevant law, the Court concludes that the California Court of Appeal's rejection of Petitioner's Miranda, false testimony, and ineffective assistance of counsel claims was neither contrary to nor an unreasonable application of any federal law clearly established by the Supreme Court. Moreover, the Court concludes that Petitioner's involuntary confession and police misconduct claims fail on the merits after de novo review. Finally, the Court declines to issue a certificate of appealability.

## I.     Analysis of Petitioner's Claims

### A.     Legality of Petitioner's Confession

Petitioner argues that he did not knowingly and intelligently waive his rights under Miranda v. Arizona, 384 U.S. 436 (1966) and its progeny before speaking with the police, and thus his subsequent confession that he "beat the shit out of" CC after an argument because she would not "say the relationship was over" should have been suppressed. (Doc.

No. 1 at PageID 32; Doc. No. 81 at PageID 4617.) Petitioner also argues that his confession was coerced. (Doc. No. 1 at PageID 37; Doc. No. 81 at PageID 4623.) The Court addresses each argument in turn.

### 1. **Miranda** Claim

"Waiver of the right to counsel must be done knowingly, intelligently, and voluntarily." Rodriguez v. McDonald, 872 F.3d 908, 921–22 (9th Cir. 2017). A suspect's rights waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and knowing and intelligent in the sense that it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). The validity of a waiver depends "upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." Edwards v. Arizona, 451 U.S. 477, 482 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

When Petitioner was discovered by the police, he had overdosed on Benadryl. (Doc. No. 1-2 at PageID 145.) The officer that later questioned him, Officer Bianco, testified that Petitioner was largely unresponsive when he was first arrested, but that he "became more responsive and talkative" after treatment at a local hospital. (Doc. No. 1-4 at PageID 405.) The officer further testified that he admonished Petitioner of his Miranda rights "as he became more coherent," that Petitioner indicated that he understood his rights and would be willing to speak to the officer, and that Petitioner subsequently confessed to abusing CC. (Id. at PageID 406.)

Petitioner claims the Benadryl affected his ability to knowingly and voluntarily waive his rights. (Doc. No. 81 at PageID 4617–4620.) Petitioner presented this claim to the Court of Appeal, which rejected it as follows:

> [Petitioner] was arrested after the police found him hiding in the attic. He stated he had overdosed on Benadryl, but after receiving treatment at a hospital, he told the police "that he and his girlfriend had been arguing for several days and they got into a physical fight. He said that during the

argument, 'I just wanted her to say the relationship was over and she wouldn't do it, so I beat the shit out of her'; 'I can't believe I did that.'" CC told the police about the incidents during two police interviews, but later recanted at trial and claimed the injuries were caused by consensual sexual acts.

. . .

Many of [Petitioner's] contentions challenge the testimony of a police officer, in which the officer stated that [Petitioner] waived his rights after a valid Miranda warning and admitted he hit CC. In his petition, [Petitioner] alternatively contends that he was not given a Miranda warning, that he was given a Miranda warning but was under the influence of drugs at the time such that he lacked the capacity to waive his rights, or that he was never "admonished or interrogated" and the police fabricated his admission. Regardless of the exact theory, [Petitioner's] contentions amount to a claim that the officer lied at trial in some regard. [Petitioner], however, presents no evidence to support his conclusion beyond inconclusive medical records regarding his mental state unsupported by expert testimony.

. . .

A petitioner seeking habeas corpus relief bears a heavy burden to plead and prove sufficient grounds for relief. "At the pleading stage, the petition must state a prima facie case for relief. To that end, the petition 'should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." Conclusory allegations made without any explanation of their factual bases are insufficient to state a prima facie case or warrant an evidentiary hearing.

In the absence of other evidence, [Petitioner] contends that this court must accept his own declaration, which he contends offers the true version of events and reveals the lies of the other witnesses. A self-serving declaration by a habeas corpus petitioner is, by itself, insufficient to meet the burden of stating a prima facie case for relief.

(Doc. No. 33-27 at PageID 3109–11 (citations and internal quotation marks omitted).)

The Court of Appeal's resolution of Petitioner's <u>Miranda</u> claim was not an unreasonable application of any holding by the Supreme Court. 28 U.S.C. § 2254(d)(1).

3:17-cv-00421-H-MDD

The Ninth Circuit has explained that:

> While it is true that a waiver of one's *Miranda* rights must be done intelligently, knowingly, and voluntarily, the Supreme Court has never said that impairments from drugs, alcohol, or other similar substances can negatively impact that waiver. We have held that an intoxicated individual can give a knowing and voluntary waiver, so long as that waiver is given by his own free will. However . . . there [is] no established law regarding the effect of alcohol and drugs on the voluntariness of a *Miranda* waiver.

Matylinsky v. Budge, 577 F.3d 1083, 1095–96 (9th Cir. 2009) (citations omitted). Since there is no Supreme Court precedent on point, by definition the Court "cannot hold that the [California] court's decision here was contrary to any established Supreme Court precedent." Id. at 1096.

Moreover, the Court of Appeal's decision to accept Officer Bianco's representation that he only administered the Miranda warning after Petitioner regained lucidity was not "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Petitioner presented no direct evidence—other than his own self-serving declaration—that Officer Bianco lied about Petitioner's lucidity at the time of the Miranda warning, and Petitioner's scraps of medical evidence do not directly contradict the officer's account. Moreover, the December 12, 2017 declaration submitting by Nurse Melissa Beane was not part of "the evidence presented in the State court proceeding," and cannot support relief under § 2254(d)(2).

The Court accordingly denies Petitioner's Miranda claim.

### 2. Coercion

Petitioner also argues that his confession must been the product of unlawful coercion, because of the Benadryl he took. (Doc. No. 81 at PageID 4623–26.) The Court of Appeal denied this claim on procedural grounds, but Respondent did not assert procedural default, and thus the Court reviews this claim de novo. See Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003) (holding that the initial burden to be met in determining the adequacy of a state procedural bar is Respondent's and as such the state must

"adequately ple[a]d the existence of an independent and adequate state procedural ground as an affirmative defense").

The Fourteenth Amendment's Due Process Clause prohibits the use of a coerced—and thus involuntary—confession at trial. See, e.g., Lynumn v. Illinois, 372 U.S. 528, 534 (1963); Blackburn v. Alabama, 361 U.S. 199, 205 (1960). A confession is illegally coerced if it is not "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986) (footnote omitted). Thus, "coercive police activity is a necessary predicate to the find that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167.

Here, Petitioner has identified no coercive police conduct sufficient to support his due process claim. Petitioner's bare assertions, without significantly more evidence, do not establish his entitlement to relief. See Connelly, 479 U.S. at 164 (confession was not involuntary merely because suspect was mentally ill and suffering from psychotic symptoms when questions, where there was no police misconduct); United States v. Luck, 852 F.3d 615, 623 (6th Cir. 2017) (confession was not involuntary merely because suspect was addled by Benadryl and melatonin during questioning absent any police misconduct). The Court thus denies Petitioner's due process claim.

## B. Ineffective Assistance of Counsel

Petitioner next argues that he suffered from ineffective assistance of counsel at his trial, in violation of his Sixth Amendment rights. Specifically, he argues that his trial counsel rendered prejudicial deficient performance when counsel failed to: (i) investigate and move to suppress statements he made after his arrest; (ii) investigate and move to suppress CC's statements to the police; (iii) call witnesses and present evidence at trial; (iv) effectively advise him regarding the prosecution's plea offer; (v) present a viable legal

defense; and (vi) adequately impeach witness testimony. Petitioner also raises a claim of cumulative error. (Doc. No. 81 at PageID 4626–4651.)

Most of Petitioner's ineffective assistance of counsel claims, along with his cumulative error claim, were rejected on the merits by the California Court of Appeal, which reasoned as follows:

> . . . [Petitioner's] contentions regarding ineffective assistance of counsel and prosecutorial misconduct are unsupported by any actual evidence to support his factual assertions. He contends, inter alia, that his counsel failed to call certain witnesses, investigate defenses, and retain medical experts, but offers no proof of the validity of these contentions. Likewise, he contends the prosecutor knowingly introduced perjured testimony, but submits no evidence regarding the prosecutor's knowledge or whether the testimony was indeed false.
>
> A petitioner seeking habeas corpus relief bears a heavy burden to plead and prove sufficient grounds for relief. "At the pleading stage, the petition must state a prima facie case for relief. To that end, the petition 'should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." Conclusory allegations made without any explanation of their factual bases are insufficient to state a prima facie case or warrant an evidentiary hearing.
>
> In the absence of other evidence, [Petitioner] contends that this court must accept his own declaration, which he contends offers the true version of events and reveals the lies of the other witnesses. A self-serving declaration by a habeas corpus petitioner is, by itself, insufficient to meet the burden of stating a prima facie case for relief.

(Doc. No. 33-27 at PageID 3111–12 (citations and internal quotation marks omitted.)[1]

---

[1] Some of Petitioner's ineffective assistance claims were not presented to and adjudicated on the merits by the California courts. However, because these claims fail on the merits under de novo review, the Court exercises its discretion to sidestep any issue of procedural default. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

### 1.    Governing Law

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel in critical stages of criminal proceedings, including on appeal.  <u>Lafler v. Cooper</u>, 566 U.S. 156, 165 (2012).  However, "[t]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation." <u>Strickland v. Washington</u>, 446 U.S. 668, 689 (1984).  Instead, "[t]he purpose is simply to ensure that criminal defendants receive a fair trial."  <u>Id.</u>

In <u>Strickland</u>, the Supreme Court held that Sixth Amendment ineffective assistance of counsel claims have two components.  <u>Id.</u> at 687; <u>see also</u> <u>Williams</u>, 529 U.S. at 391 ("[The <u>Strickland</u> test] qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'")  "First, [a petitioner] must show that counsel's performance was deficient."  <u>Strickland</u>, 466 U.S. at 687.  "Second, [a petitioner] must show that the deficient performance prejudiced the defense."  <u>Id.</u>

The first component of the <u>Strickland</u> test requires a showing that counsel's representation "fell below an objective standard of reasonableness."  <u>Id.</u> at 688.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms," and is "highly deferential" to counsel.  <u>Id.</u> at 688-89; <u>see also</u> <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010) ("Surmounting <u>Strickland</u>'s high bar is never an easy task.").  "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in light of exercise and reasonable judgment."  <u>Strickland</u>, 466 U.S. at 690.  This Court must apply a "heavy measure of deference" to the reasonableness of counsel's decisions.  <u>Id.</u>  Counsel's decisions must be "assessed in light of the information known at the time . . . not in hindsight."  <u>Id.</u> at 680.

The second component of the <u>Strickland</u> test requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  A petitioner must show, in essence, that the errors of counsel "undermine confidence in the outcome" of the petitioner's criminal proceedings.  <u>Id.</u>

Under AEDPA, a federal court's review of an ineffective assistance of counsel claim is "doubly deferential." Pinholster, 563 U.S. at 190 (citation omitted); see also Harrington, 5623 U.S. at 105 ("The standards created by Strickland and § 2254(d) are both 'highly deferential.'"). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable." Harrington, 562 U.S. at 105. Rather, the proper "question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

### 2. Failure to Suppress Arrest Statements

Petitioner first argues that defense counsel was ineffective in failing to take steps to suppress his confession. Petitioner argues that, if counsel had obtained the records from his post-arrest medical treatment, she would have discovered that Petitioner was groggy from Benadryl abuse at the time of his questioning, and would have been able to have his confession suppressed. (Doc. No. 81 at PageID 4629.) Because the Court of Appeal rejected this claim on the merits, it is subject to AEDPA review.

The Court concludes that a reasonable jurist could find that trial counsel's performance was not deficient, and did not cause prejudice. As explained earlier, Petitioner has presented no evidence other than his own self-serving representations contradicting Officer Bianco's account that he only questioned Petitioner after he had regained lucidity following medical treatment. And moreover, Petitioner has identified no police misconduct sufficient to support a valid coercion claim. Accordingly, Petitioner has not demonstrated a reasonable probability that any motion to suppress would have been successful. See, e.g., James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994) ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.").

### 3. Failure to Suppress CC's Statements

Petitioner next argues that his trial counsel was ineffective in failing to obtain the suppression of CC's initial statements to the police alleging that Petitioner severely battered her. (Doc. No. 81 at PageID 4633.) Because the California courts rejected this claim on the merits, it is subject to AEDPA review.

The Court concludes that a reasonable jurist could find that Petitioner failed to demonstrate either deficient performance or prejudice. Petitioner has identified no basis on which the trial court could or would have suppressed CC's statements. The statements were clearly relevant to the offenses charged. Moreover, the statements were admitted at trial under California Evidence Code § 1235, which provides that "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." (Doc. No. 33-5 at PageID 1336.) The trial court determined that this statute applied and admitted CC's initial statements to the police because those statements were inconsistent with her trial testimony that all of her injuries were the result of consensual sexual activity with Petitioner. (Id.) The Court is, of course, bound by the California courts' interpretation of California law. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Because Petitioner has made no showing that CC's statements to the police were inadmissible, his trial counsel was not ineffective for failing to obtain the suppression of those statements. James, 24 F.3d at 27.

### 4. Failure to Call Witnesses and Present Evidence at Trial

Petitioner next argues that trial counsel was ineffective for failing to: (i) call his brother, sister, grandmother, and friend as character witnesses; (ii) call one of his neighbors, his former therapist, and his grandmother to give testimony designed to show that CC had appropriated other stories of domestic violence in fabricating her allegations against Petitioner; (iii) call a medical expert to testify that Petitioner would have been too groggy after his arrest to provide a knowing and voluntary confession, and that CC's allegations were physically impossible; (iv) call Petitioner himself to assert his own innocence; (v) introduce Petitioner's post-arrest medical records; (vi) introduce photographs of injuries Petitioner suffered during his arrest to undermine the arresting officer's credibility; (vii) introduce medical records for the treatment CC sought after being battered by Petitioner; (viii) introduce Petitioner's mental health treatment records from

when he was 14 years old; and (ix) introduce CC's testimony from a Family Court hearing regarding a restraining order CC obtained against Petitioner. (Doc. No. 81 at PageID 4634–4646.)

These claims were rejected on the merits by the California Court of Appeal, and are thus subject to AEDPA review.

Character Witnesses

Petitioner first argues that his trial counsel should have called several family members and a friend to attest to Petitioner's good character. (Doc. No. 1 at PageID 14.) However, trial counsel's failure to call these witnesses did not amount to deficient performance and did not cause prejudice. None of these witnesses had personal knowledge of facts relevant to the charges, and thus could not personally attest to Petitioner's innocence. Moreover, any testimony these witnesses could have given would have been "suspect based on their close relationship with" Petitioner. See Gonzalez v. Wong, 667 F.3d 965, 988 (9th Cir. 2011) (holding that it was not ineffective assistance to fail to call family members who had no personal knowledge of the charged crimes as character witnesses).

Domestic Violence Witnesses

Petitioner next argues that trial counsel should have called his neighbor, Dion Joyce, to testify that he spent time living with Petitioner and CC after his own domestic violence incident. Petitioner speculates that CC decided to wrongfully accuse Petitioner of domestic violence after hearing Joyce's story. (Doc. No. 81 at PageID 4637.) Petitioner also argues that trial counsel should have called his therapist and his grandmother to testify that he was abused in 1996. (Doc. No. 1 at PageID 14.) Petitioner argues that CC modeled her fabricated abuse allegations after the abuse he suffered as a child. (Doc. No. 1 at PageID 12.)

The Court concludes that Petitioner cannot demonstrate deficient performance or prejudice from trial counsel's failure to call these witnesses. With respect to Joyce, Petitioner has no evidence whatsoever that CC used Joyce's domestic violence incident as

a model for her domestic violence allegations. Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (holding that mere speculation that a witness might have given helpful information if interviewed does not establish ineffective assistance); Dows v. Wood, 211 F.3d 480, 486–87 (9th Cir. 2000) (holding that counsel's failure to interview an alleged alibi witness did not constitute ineffective assistance because there was "no evidence that this witness would have provided helpful testimony"). And with respect to Petitioner's therapist and grandmother, CC testified at trial that she used stories Davidson had told her about abuse he had suffered as a child to help her fabricate her own allegations of abuse. (Doc. No. 33-6 at PageID 1507.) Thus, any testimony given by Petitioner's grandmother and therapist on the same subject would have been cumulative. Matylinsky, 577 F.3d at 1097 (holding that petitioner "cannot show prejudice for failure to present what is most likely cumulative evidence").

Medical Experts

Petitioner argues that trial counsel should have called medical experts to testify that Petitioner could not knowingly and voluntarily waive his Miranda rights after his arrest, and that CC's asserted injuries were physically impossible. (Doc. No. 81 at PageID 4637–4642.) However, these claims are wholly speculative and conclusory. Petitioner offers no reason to believe that any expert would have testified as he wishes, and thus cannot show either deficient performance or prejudice. See Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (no ineffective assistance of counsel for failing to retain expert where petitioner did not offer evidence that an expert would have testified); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997); (concluding that mere speculation about how an expert might have testified is not enough to establish prejudice).

Petitioner's Own Testimony

Petitioner argues that his trial counsel should have called him to the stand to assert his own innocence. (Doc. No. 1 at PageID at PageID 14–15.) However, Petitioner had every opportunity to notify his trial counsel or the trial court of his desire to testify, and his failure to do so dooms his ineffective assistance claim. See United States v. Nohara, 3 F.3d

1239, 1244 (9th Cir. 1993) (no ineffective assistance of counsel where defendant remained "silent in the face of his attorney's decision not to call him as a witness"); accord United States v. Pino-Noriega, 189 F.3d 1089, 1094 (9th Cir 1999) ("When a defendant remains 'silent in the fact of his attorney's decision not to call him as a witness,' he waives the right to testify." (citation omitted)); United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993) ("[W]aiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so.").

Post-Arrest Medical Records

Petitioner argues that his counsel was ineffective for failing to obtain his post-arrest medical records to argue that he could not have knowingly and voluntarily waived his Miranda rights prior to his confession because of his Benadryl abuse. (Doc. No. 81 at PageID 4642.) As the Court has already explained however, Petitioner has not demonstrated that he has a meritorious Miranda claim, and thus trial counsel was not ineffective for failing to pursue this line of inquiry. James, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.")

Post-Arrest Photographs

Petitioner was bitten by a police dog during his arrest, and also had cigarette burns on his hand. (Doc. No. 81 at PageID 4642.) Officer Bianco testified at trial that he did not recall seeing these injuries when he arrived at the hospital to interview Petitioner. (Doc. No. 33-6 at PageID 1592.) Petitioner argues that trial counsel should have introduced photographs of these injuries to undermine Officer Bianco's credibility, and thus undermine the officer's testimony that Petitioner lucidly confessed to abusing CC.

The Court concludes that Petitioner cannot establish either deficient performance or prejudice for this claim. The evidence identified by Petitioner would have had at best a minimal effect on Officer Bianco's credibility; after all, the officer did not testify that Petitioner's injuries did not occur, merely that he did not recall seeing them. Moreover, this entire line of inquiry is unrelated to the central issue at trial—whether CC consented to Petitioner's domestic battery. There is no reasonable probability that the evidence

identified by Petitioner would have altered the trial outcome.

CC's Medical Records

Petitioner next argues that trial counsel should have obtained CC's post-battery health records, which show that CC received stitches for a cut on the lip. (Doc. No. 4643–44.) However, there was no dispute at trial as to whether CC was injured, only whether the injuries were the result of consensual sexual activity or criminal battery. Petitioner therefore cannot show either deficient performance or prejudice for the failure to introduce these records.

Mental Health Records

Petitioner also argues that trial counsel was deficient for failing to introduce mental health records from 2001 and 2013. (Doc. No. 1-3 at PageID 189–90, 195–97.) However, neither report had any relevance whatever to the issue of whether CC consented to the battery, and the 2013 records were not even produced until after Defendant was convicted. Petitioner therefore cannot show either deficient performance or prejudice for the failure to introduce these records.

Family Court Records

Finally, Petitioner argues that trial counsel should have introduced records from Family Court wherein CC testified that Petitioner did not abuse her. (Doc. No. 1 at PageID 14.) However, CC recanted her abuse allegations at trial and testified at length on Petitioner's behalf. The Family Court records would have been entirely cumulative. Matylinsky, 577 F.3d at 1097 (holding that petitioner "cannot show prejudice for failure to present what is most likely cumulative evidence").

### 5. Ineffective Advice Regarding Plea Offer

Petitioner alleges that, prior to trial, the prosecution offered him a prison sentence of six years in exchange for his guilty plea. Petitioner argues that his trial counsel was ineffective for failing to advise him to accept the plea agreement. (Doc. No. 1 at PageID 16.) This claim was not adjudicated on the merits by the California Courts, and thus the Court reviews it de novo.

A criminal defendant is entitled to effective assistance of counsel during plea negotiations. <u>Lafler v. Cooper</u>, 566 U.S. 156, 162-63 (2012). Specifically, "a defendant has the right to make a reasonably informed decision whether to accept a plea offer." See <u>Turner v. Calderon</u>, 281 F.3d 851, 880 (9th Cir. 2002) (citation omitted). Accordingly, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." <u>Missouri v. Frye</u>, 566 U.S. 134, 145 (2012). Where counsel did inform petitioner of a plea offer, in order for the petitioner to show that his counsel performed deficiently, he "must demonstrate gross error on the part of counsel" that led to rejection of the offer. See <u>Turner</u>, 281 F.3d at 880 (quoting <u>McMann v. Richardson</u>, 397 U.S. 759, 772 (1970)); <u>see also</u> <u>United States v. Day</u>, 969 F.2d 39, 43 (3rd Cir. 1992) (with respect to counsel's advice during the plea process, it must be shown that "the advice . . . [the defendant] received was so incorrect and so insufficient that it undermined his ability to make an intelligent decision about whether to accept the [plea] offer").

To satisfy the prejudice prong of <u>Strickland</u> when a defendant has rejected a plea offer, the "defendant must show the outcome of the plea process would have been different with competent advice." <u>Lafler</u>, 566 U.S. at 162-63. That is, the defendant "must show that, but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." <u>Id.</u> at 164.

Here, the record makes clear that Petitioner cannot satisfy <u>Strickland</u>'s prejudice prong, even assuming he could show deficient performance. The plea offer was discussed with him in detail in open court. The prosecutor explained that there were "two alternative offers [proposed], either count 2 with both allegations, this would be on the amended information, a range of six to ten, sentence to court or count 2 and 3 which would be two

strikes, stip six." (Doc. No. 33-5 at PageID 1115.)  The trial court then further explained:

> And what that means then, if there's one count, which would mean one strike, that follows [Petitioner] through the rest of his life.  An admission to the two allegations and the allegations being that personal -- that he personally inflicted great bodily injury on Charlene Corpus and that he personally used a deadly and dangerous weapon, a metal flashlight, with a top range maximum time that [Petitioner] can be ordered to serve incarcerated of ten years.  And that would be the decision of the judge.  That would be me.
>
> . . .
>
> The other offer to resolve this case is that [Petitioner] pleads guilty to Count 2, Count 2, without the allegation . . . Count Number 3 standing alone, without any allegation either, with an agreement, and the Court's agreement as well, that the longest [Petitioner] would serve in custody for this conduct in this case, afterwards he would be released on parole, would be six years.  However, should he reoffend, conduct himself in any criminal fashion during his lifetime, he will have what will be known as two strikes on his criminal record.  And with the third strike, if he was convicted he could be incarcerated for his life.

(Id. at PageID 1115–16.)  Petitioner responded, "Yes, sir" to this explanation.  (Id. at PageID 1116.)

Thus, the trial court's clear and detailed explanation gave Petitioner all of the knowledge he needed to make an informed decision as to whether to plead guilty. Moreover, Petitioner's earlier comment that he would only plead guilty "if the offer will include my freedom," (id. at PageID 1115), suggests that he turned down the plea deal because he wished to pursue outcomes that would result in no jail time, and not because of any advice his counsel gave.  The Court accordingly rejects this claim as well.

### 6.    Failure to Present a Viable Legal Defense

Petitioner argues that trial counsel failed to present a viable defense, because counsel's primary argument was that CC consented to Petitioner's battery, and consent is not a defense to charges of torture, infliction of corporal injury on a cohabitant, or making criminal threats.  (Doc. No. 81 at PageID 4646.)  See Cal. Penal Code §§ 206, 273.5, 422;

see also <u>People v. Toldeo</u>, 26 Cal. 4th 221, 227-28 (2001); <u>People v. Pre</u>, 117 Cal. App. 4th 413, 419 (2001); <u>People v. Campbell</u>, 67 Cal. App. 4th 305, 307- 08 (1999).  This claim was not adjudicated on the merits by the California courts, and thus the Court reviews it de novo.

The trial court permitted Petitioner to pursue a mistake of fact defense, and gave the following instruction:

> The [Petitioner] is not guilty of torture, corporal injury to spouse or criminal threats if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact.

> If the [Petitioner's] conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit torture, corporal injury to spouse or criminal threats.

> If you find that the [Petitioner] believed that [CC] consented to being battered and threatened and if you find that belief was reasonable, he did not have the specific intent or mental state required for torture, corporal injury to spouse or criminal threats.

> If you have a reasonable doubt about whether the [Petitioner] had specific intent or mental state required for torture, corporal injury to spouse or criminal threats, you must find him not guilty of those crimes.

(Doc. No. 33-2 at PageID 957.)

Thus, although consent is not formally a defense to the charges Petitioner was accused of, the trial court effectively permitted Petitioner to pursue a consent defense by instructing the jury to find him not guilty if he had a reasonable belief that CC consented to the battery.  Thus, not only was trial counsel's defense strategy viable, it was the obvious defense given CC's recantation of her initial allegations.  There was no deficient performance or prejudice.

### 7. Failure to Adequately Impeach Witness Testimony

Petitioner argues that trial counsel was ineffective for failing to impeach the testimony of the four officers that were involved in Petitioner's arrest and taking CC's

statement.  (Doc. No. 81 at PageID 4648.)  Those officers were Officer Bianco, who took Petitioner's statement at the hospital after his arrest, Officers Demas and Hernandez, who took statements from CC, and Officer Pimienta, who was involved in Petitioner's arrest.

Petitioner argues that trial counsel should have impeached Officer Bianco's testimony by introducing his post-arrest medical records, which supposedly would have shown that he was too groggy to knowingly and voluntarily confess at the time of his statement.  (Id.)  As the Court has already explained, however, Petitioner's medical records do not contradict Officer Bianco's account that he only questioned Petitioner after his lucidity improved following time and medical treatment.  Trial counsel's decision not to pursue this line of inquiry was not unreasonable.

Petitioner additionally argues that trial counsel should have pointed out a contradiction in Officer Hernandez's testimony—at the preliminary hearing, Officer Hernandez testified that CC had accused Petitioner of holding a knife to her throat, while CC's statement to the officer alleges that Petitioner tried to cut her hand with a pocket knife.  (Doc. No. 33-2 at PageID 900.)  However, the jury acquitted Petitioner of the allegation that he used a knife against CC, undermining any argument that counsel's performance was deficient.

Petitioner further argues that trial counsel should have introduced photographs of cigarette burns on Petitioner's hands to impeach Officer Pimienta's testimony that she could not recall seeing any injuries to Petitioner's hands.  (Doc. No. 1 at PageID 19.)  However, as the Court previously explained in rejecting Petitioner's argument that counsel should have introduced the injury photographs into evidence, it was not ineffective assistance for trial counsel to refuse to linger on this entirely peripheral side issue that would have had at best a minimal impact on the officer's credibility.

Finally, Petitioner fails to explain what trial counsel should have done to impeach Officer Demas's testimony, or how that impeachment would have impacted the trial.  This claim is thus too undeveloped to warrant habeas relief.  Jones v. Gomez, 66 F.3d 199, 205 (9th Cir. 1995) (holding that conclusory allegations are insufficient to support habeas

relief).

## 8.    Cumulative Error

Lastly, Petitioner argues that even if trial counsel's errors were not prejudicial individually, they collectively amounted to ineffective assistance of counsel.  (Doc. No. 81 at PageID 4649.)  See, e.g., Boyde v. Brown, 404 F.3d 1159, 1176 (9th Cir. 2005) ("We must analyze each of [petitioner's] clams separately to determine whether his counsel was deficient, but 'prejudice may result from the cumulative impact of multiple deficiencies.'" (citation omitted)).    However, Petitioner has not demonstrated that trial counsel performance "fell below an objective standard of reasonableness" in any respect. Strickland, 466 U.S. at 688.  Petitioner therefore cannot demonstrate cumulative error.  See, e.g., Fairbank v. Ayers, 650 F.3d 1243, 1257 (9th Cir. 2011) ("[B]ecause we hold that none of [petitioner's] claims rise to the level of constitutional error, 'there is nothing to accumulate to the level of a constitutional violation.'" (citation omitted)).

## C.    False Testimony

Petitioner next claims that the prosecution committed misconduct at his trial by introducing CC's initial statements to the police accusing him of domestic battery.  (Doc. No. 1 at PageID 24–31.)  Petitioner argues that in light of CC's subsequent recantation of her allegations, and some minor inconsistencies in her initial statements, the prosecution's use of those statements violated Napue v. Illinois, 360 U.S. 264 (1959) and its progeny. (Id.)  Petitioner presented this claim to the California Court of Appeal, which rejected it on the merits as follows:

> [Petitioner] contends the prosecutor knowingly introduced perjured testimony, but submits no evidence regarding the prosecutor's knowledge or whether the testimony was indeed false.
>
> A petitioner seeking habeas corpus relief bears a heavy burden to plead and prove sufficient grounds for relief.  "At the pleading stage, the petition must state a prima facie case for relief.  To that end, the petition 'should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts

and affidavits or declarations." Conclusory allegations made without any explanation of their factual bases are insufficient to state a prima facie case or warrant an evidentiary hearing.

In the absence of other evidence, [Petitioner] contends that this court must accept his own declaration, which he contends offers the true version of events and reveals the lies of the other witnesses. A self-serving declaration by a habeas corpus petitioner is, by itself, insufficient to meet the burden of stating a prima facie case for relief.

(Doc. No. 33-27 at PageID 3111–12 (citations and internal quotation marks omitted).) The claim is thus subject to AEDPA review.

"The knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside." Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing United States v. Agurs, 427 U.S. 97, 103 (1976)). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. However, the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence. United States v. Geston, 299 F.3d 1130, 1135 (9th Cir. 2002). To prevail on such claims, three things are required: (1) the testimony or evidence must be false, (2) the prosecution must have known or should have known it was false, and (3) the false testimony must be material. See Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (citing United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003)). For purposes of a Napue violation, evidence is "material" if there is "'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Jackson v. Brown, 513 F.3d 1057, 1076 (9th Cir. 2008) (emphasis in original) (citation omitted).

Here, Petitioner has presented no evidence that the prosecution knowingly suborned perjury, and no convincing evidence that CC's initial allegations were false. "Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." Tapia v. Tansy, 926 F.2d 1554, 1563 (10th Cir. 1991); accord Bucci

v. United States, 662 F.3d 18, 40 (1st Cir. 2011). CC's initial allegations were consistent with her extensive injuries. Moreover, it is unfortunately quite common for domestic violence victims to recant their allegations against their abusers, and the prosecution submitted expert testimony to that effect at trial. See, e.g., United States v. Young, 316 F.3d 649, 658 (7th Cir. 2002) (observing that "abuse victims often recant their statements to protect their abusers"); Thomas v. Dillard, 818 F.3d 864, 895 (9th Cir. 2016) (Bea, J., dissenting) (collecting authorities and observing that "it is well-documented that victims of domestic violence—even those who initially report their abusers to police—more often than not 'recant or refuse to cooperate' with the police seeking to help them"). The California courts did not unreasonably apply federal law in rejecting Petitioner's false testimony claim.

### D.  Police Misconduct

Petitioner's last ground for habeas relief is that the police used excessive force in arresting him; specifically, that the police committed misconduct by permitting a police dog to bite him when he posed no threat to the arresting officers. (Doc. No. 1 at PageID 39–40.) This claim fails on its face for two reasons. First, an "illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." United States v. Crews, 445 U.S. 463, 474 (1980) (citing Gerstein v. Pugh, 420 U.S. 103, 119 (1975)). Thus, Petitioner cannot obtain habeas relief by demonstrating a Fourth Amendment excessive force claim. His remedy, if anything, is monetary damages under 42 U.S.C. § 1983. Second, Stone v. Powell, 428 U.S. 465 (1976) bars federal habeas review of Fourth Amendment claims unless the state did not provide an opportunity for full and fair litigation of those claims. Newman v. Wengler, 790 F.3d 876, 880 (9th Cir. 2015) (holding that the Stone doctrine survived the passage of AEDPA). Because Petitioner could have brought his Fourth Amendment claim before the California courts, he cannot obtain habeas relief on that claim now. See Gordon v. Duran, 895 F.2d 610, 613–14 (9th Cir. 1990).

## II.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts provides that the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." 28 U.S.C. foll. § 2254. A certificate of appealability may be issued only if the defendant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on the merits, a petitioner satisfies the above requirement by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, after reviewing the petition, the Court concludes that jurists of reason would not disagree with the Court's analysis of Petitioner's claims, and therefore declines to issue a certificate of appealability.[2]

### Conclusion

For the foregoing reasons, the Court: (i) denies the petition; (ii) adopts the Report and Recommendation as supplemented by the reasoning in this Order; (iii) overrules Petitioner's objections; (iv) affirms the Magistrate Judge's denial of motions; (v) denies all pending motions; and (vi) declines to issue a certificate of appealability. The Clerk of the Court is directed to enter judgment in favor of Respondent.

**IT IS SO ORDERED.**

DATED:  August 15, 2018

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[2]    The Court has reviewed each of Petitioner's pending motions, and denies them on the merits. (Doc. Nos. 83, 85, 87, 89.)